# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| THE UPPER DECK COMPANY,<br><br>                             Plaintiff,<br><br>   v.<br><br>PIXELS.COM, LLC,<br><br>                            Defendant. | Case No. 24-cv-0923-BAS-DEB<br><br>**ORDER DENYING DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF CHRISTIAN TREGILLIS**<br><br>**(ECF No. 77)** |
|---|---|

Before the Court is Defendant Pixels.com's ("Pixels") motion to exclude the testimony of Plaintiff The Upper Deck Company's ("Upper Deck") expert witness, Christian Tregillis. (ECF No. 77.) Upper Deck opposes. (ECF No. 100.) Pixels replies. (ECF No. 108.) The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); CivLR 7.1(d). For the following reasons, the Court **DENIES** Pixels' motion (ECF No. 77).

## I. BACKGROUND

On March 26, 2024, Upper Deck commenced this action against Pixels. (Compl., Ex. 1 to Notice of Removal, ECF No. 1.) On May 28, 2024, Pixels removed the action to federal court. (Notice of Removal.) Upper Deck subsequently filed a First Amended Complaint ("FAC") alleging violation and deprivation of the right of publicity, violations

of the Lanham Act, registered trademark infringement, violation of California's Unfair Competition Law, and California common law unfair competition. (FAC ¶ 1, ECF No. 24.)

At the center of this dispute, Upper Deck claims that Pixels has marketed and sold wall décor featuring images that infringe upon Upper Deck's trademarks and Michael Jordan's name, image, likeness, and publicity rights. (*Id.* ¶ 25.) Upper Deck brings this action pursuant to an exclusive agreement with Jordan (the "Jordan Agreement") for the use of his name, image, likeness, and other publicity rights. (*Id.* ¶ 19.) Upper Deck asserts the agreement also gives Upper Deck the right to commence actions on behalf of Jordan for infringement of the rights assigned in the Jordan Agreement. (*Id.* ¶ 20.)

In support of its claims, Upper Deck has designated Christian Tregillis as a damages expert to opine on the fair market value of Pixels' alleged unauthorized use of Jordan's rights. (Expert Report of Christian Tregillis ("Tregillis Report") ¶ 1, ECF No. 82-4.) Pixels moves to exclude Tregillis's testimony, contending that his methodology is unreliable and based upon insufficient facts and data. (ECF No. 77 at 2:7-10.) Pixels also contends that the premium multiplier Tregillis uses in his fair market value calculation is unreliable and that Tregillis's two "Evidence Indicates" opinions are irrelevant. (*Id.* at 13:5-8, 21:8-12.)

## II. LEGAL STANDARD

Federal Rule of Evidence 702 establishes several requirements for admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must "help the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts or data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case.

Under *Daubert* and its progeny, the trial court is tasked with assuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "Expert opinion testimony is

relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation modified). Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion. *Daubert*, 509 U.S. at 596. The judge is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

The tests for admissibility in general, and reliability in particular, are flexible. *Primiano*, 598 F.3d at 564. The Supreme Court has provided several factors to determine reliability: (1) whether a theory or technique is testable; (2) whether it has been published in peer-reviewed literature; (3) the error rate of the theory or technique; and (4) whether it has been generally accepted in the relevant scientific community. *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002) (summarizing *Daubert*, 509 U.S. at 592–94), *overruled on other grounds by Est. of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014). These factors are meant to be "helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citation modified). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his [or her] methodology." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Once the threshold established by Rule 702 is met, the expert may testify, and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565.

After admissibility is established to the court's satisfaction, attacks aimed at the weight of the evidence are the province of the fact finder, not the judge. *Pyramid Techs.,*

*Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014).  The court should not make credibility determinations that are reserved for the jury.  *Id.*

### III. ANALYSIS

Pixels argues Tregillis's opinions are inadmissible because Tregillis (1) employs a faulty and unreliable methodology; (2) relies upon insufficient facts and data; and (3) provides irrelevant factual opinions.  (ECF No. 77 at 2:7-17.)

Pixels does not challenge Tregillis's qualifications.  (*See generally* Mot.)  Tregillis holds an M.B.A. in Finance and Accounting.  (Tregillis Report at App. A.)  He has more than thirty years of experience analyzing financial, accounting, economic, statistical, and market issues, primarily relating to disputes, valuations, and license agreements covering intellectual property rights.  (*Id.*)  Tregillis has held leadership positions with many public accounting and licensing professional groups.  (*Id.*)  He is also accredited in Business Valuation and certified in Financial Forensics, Public Accounting, and Licensing.  (*Id.*)  Thus, finding Tregillis sufficiently qualified to render his opinion, the Court turns to Pixels' arguments for exclusion.

#### A. Methodology

Tregillis calculates the fair market value of Pixels' use of Jordan's rights by analyzing comparable licenses for rights similar to those used by Pixels as a starting point to construct a hypothetical license.  (Tregillis Report ¶¶ 118-21.)  Tregillis then adjusts the value of the benchmark comparable license to account for the other athletes included in the benchmark license, the length of time of Pixels' use, and the fact that Pixels' use of Jordan's rights was not subject to any quality assurance or approval clauses.  (*Id.* ¶¶ 122, 126.)  Pixels argues that the benchmark agreement chosen by Tregillis is insufficiently comparable and that Tregillis makes improper assumptions to inflate the value of the benchmark license.  (ECF No. 77 at 9:19–10:1.)

Damages determined through a hypothetical license are appropriate "provided the amount is not based on undue speculation."  *See Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004) (citation modified); *see also Marketquest Grp., Inc. v.*

*BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018) (permitting hypothetical licensing damages in a Lanham Act dispute "if the evidence provides a sufficiently reliable basis to calculate such damages"). "The touchstone for hypothetical-license damages is 'the range of [the license's] reasonable market value.'" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (quoting *Polar Bear Prods.*, 384 F.3d at 709). "The question, therefore, is not what the owner would have charged, but rather what is the fair market value." *Id.* (citation modified).

Accordingly, as a starting point, Tregillis's methodology of constructing a hypothetical license to determine the fair market value of Pixels' use of Jordan's rights is an accepted and reliable method to calculate damages in an intellectual property dispute. *See Polar Bear Prods.*, 384 F.3d at 709. The Court now considers the reliability of the facts underlying Tregillis's methodology and opinions.

### 1. Underlying Facts and Data

Tregillis determines the Trends Agreement to be the most comparable to the facts at issue here and uses this agreement as the benchmark for his hypothetical license analysis. (Tregillis Report ¶ 121.) The Trends Agreement was a licensing agreement between Brevettar, described as "the exclusive licensing agent for Upper Deck," and Trends International, LLC. (*Id.* ¶ 50.) The Trends Agreement granted Trends a license to manufacture, distribute, and sell collector's edition posters and calendars featuring the name, image, likeness, signature, and statistical data of Michael Jordan, Wayne Gretzky, and Tiger Woods. (*Id.*) A later amendment to the Trends Agreement also allowed Trends to sell canvas wall décor. (*Id.* ¶¶ 56–57.)

Pixels argues that the Trends Agreement is an improper comparable because Upper Deck was not a party to it, Upper Deck did not receive royalty payments from the agreement, and the Trends Agreement was not effective until two and a half years after Pixels alleged unauthorized sales began. (ECF No. 77 at 10:4–11:1.) Pixels also asserts that Tregillis improperly inflated the annual minimum guarantee and sales made under the Trends Agreement by relying on a later amendment to the Trends Agreement that increased

the annual minimum guarantee and added another category of products covered by the Trends Agreement. (*Id.* at 11:2–12:10.) Finally, Pixels claims Tregillis improperly deflated the annual minimum guarantee payment to account for the other athletes included in the Trends Agreement. (*Id.* at 12:11-20.)

When constructing a hypothetical license, "the licenses relied on by the [rightsholder] in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009); *see also Marketquest Grp.*, 316 F. Supp. 3d at 1300 (requiring a "sufficiently reliable basis to calculate. . . damages" in absence of a prior licensing agreement). As such, "alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012). However, any hypothetical license analysis "necessarily involves an element of approximation and uncertainty." *Lucent*, 580 F.3d at 1325 (citation modified); *see also Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012) ("We emphasize that section 1117 confers a wide scope of discretion upon the district judge in fashioning a remedy." (citation modified)). "[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014); *see also Roblox Corp. v. WowWee Grp. Ltd.*, No. 22-cv-04476-SI, 2024 WL 4057418, at *14 (N.D. Cal. Sept. 3, 2024) (rejecting objections that the benchmark license was not sufficiently comparable as the objections went to the weight, not admissibility of the expert's analysis).

Here, the Trends Agreement concerned the same rights at issue in this case, Jordan's name, image, likeness, and publicity rights. (Tregillis Report ¶ 50.) Further, the Trends Agreement covered the same types of products as those at issue here—posters, calendars, and wall décor. (*Id.* ¶ 121.) The Trends Agreement also covered products similarly priced to those sold by Pixels. (*Id.*) Consequently, the Court finds the Trends Agreement sufficiently comparable to serve as a reliable basis for the hypothetical license analysis Tregillis conducts.

Each of Pixels' arguments about the specific terms of the Trends Agreement, including the parties to it, the time period it covered, the products it included, the annual minimum guarantee, and the proportion of sales attributed to each athlete under the Agreement, bears on the Agreement's comparability with the conduct at issue here. As such, these arguments go to the weight of the evidence, not its admissibility.[1] *See Ericsson*, 773 F.3d at 1227; *Roblox Corp.*, 2024 WL 4057418, at *14.

### 2. The Premium Multiplier

After identifying the Trends Agreement as the best benchmark for his hypothetical license analysis, Tregillis uses a premium multiplier to adjust for the fact that Pixels' use of Jordan's rights was not authorized and not subject to the quality assurance and approval clauses typically included in Jordan's licensing agreements. (Tregillis Report ¶ 122.) Tregillis calculates this multiplier by comparing two similar situations where Jordan's rights were used, one of which was authorized (the "Hanes Transaction") and one of which was unauthorized (the "Panini Settlement"). (*Id.* ¶¶ 124-25.) Tregillis compares the values of those transactions to calculate the percentage premium for unauthorized uses of Jordan's rights. (*Id.*) Pixels argues that the application of this premium multiplier is unreliable and that the Hanes Transaction and Panini Settlement are not reliably comparable to the conduct at issue here. (ECF No. 77 at 13:5-12.)

Hypothetical license analysis requires experts to make adjustments to the benchmark agreement to best fit the facts at issue. Indeed, upward and downward adjustments to a benchmark agreement are commonly and reliably used in hypothetical license analyses. *See, e.g.*, *Oracle Am., Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1184 (N.D. Cal. 2012) (finding an upward adjustment based on several factually supported factors to be proper under *Daubert*); *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, No.

---

[1] Pixels' arguments are further undermined by the fact that Pixels' own expert not only identifies the same hypothetical license methodology as one way to calculate damages, but also identifies the Trends Agreement as an instructive comparable. (*See* Expert Report of Lindsey Fisher ¶¶ 29, 92, ECF No. 103-5.)

2:17-cv-07639 SJO-KS, 2019 WL 8685065, at *4–5 (C.D. Cal. Dec. 3, 2019) (finding the damages expert's upward adjustment to the royalty rate sufficiently reliable to present to a jury). However, such adjustments must be based on non-speculative evidence to be sufficiently reliable. *See Oracle Corp.*, 765 F.3d at 1088 ("An award of hypothetical-license damages is appropriate provided the amount is not based on undue speculation." (citation modified)).

Here, the adjustment Tregillis applies is neither created out of whole cloth nor based on mere speculation, as Pixels asserts. Rather, Tregillis demonstrates the necessity of this premium adjustment by discussing Jordan's carefully tailored brand and restrictive approach to licensing agreements. (Tregillis Report ¶¶ 88–106.) Then, Tregillis conducts a comparative analysis using otherwise analogous transactions to calculate the value of unauthorized uses of Jordan's rights. (*Id.* ¶¶ 124-25.) This analysis is grounded in evidence, and Tregillis's application of his analysis logically follows. (*See id.*) Therefore, the premium multiplier calculation and its application to the hypothetical license are sufficiently reliable to present to a jury. *See Oracle Corp.*, 765 F.3d at 1091.

The cases cited by Tregillis in support of the premium multiplier—and also relied on by both Pixels and Upper Deck in their briefings—tend to support the reliability of the premium multiplier in this case. For example, the *Garrapata* court, in the default judgment context, ultimately recognized that "a $2 million figure appropriately compensates [the plaintiff] for the premium that would be necessarily required to induce it to agree to such a deal." *Garrapata, LLC v. Norok Innovation, Inc.*, No. CV 21-00356-CJC (PDx), 2022 WL 4099470, at *7 (C.D. Cal. May 13, 2022). In other words, the court recognized that a premium may be appropriate to incorporate into the damages award to account for the fact that the plaintiff would not have authorized the use at issue in that case. *Id* ("$2 million is a reasonable representation of the fair market value of Mr. Eastwood's services in lending his influential and known name to a hidden metatag campaign for products he likely would have been unwilling to endorse in the first place."). Although Pixels is correct that the *Garrapata* court rejected the extent of the premium proposed by the plaintiff, the court

ultimately endorsed the principle of applying a premium to account for unauthorized use. *Id.* at *6–7. Tregillis applies that same principle here.

Likewise, the *Edmondson* court did not condemn the use of any premium multipliers, but it rejected the premium multiplier applied by the expert because it was speculative. *Edmondson v. Caliente Resorts, LLC*, No. 8:15-cv-2672-T-23TBM, 2017 WL 10591833, at *6 (M.D. Fla. Aug. 31, 2017). The *Edmondson* expert's treble multiplier appeared to be "a formula entirely of [the expert's] imagination." *Id.* But here, in contrast, Tregillis backs up his premium multiplier by demonstrating why it is appropriate in this case and by calculating the premium multiplier through an evidence-based comparative analysis. (Tregillis Report ¶¶ 88–106, 124-25.)

Pixels further attacks on the premium multiplier are similarly unpersuasive.[2] Pixels argues that Tregillis does not properly verify or discuss the Hanes Transaction and Panini Settlement before using them in his analysis. (ECF No. 77 at 14:16-20, 15:14–16:8.) This argument is unconvincing, as Tregillis spends paragraphs of his report, supported by citations to the record, discussing the Hanes Transaction and Panini Settlement as well as how he uses them in his analysis. (Tregillis Report ¶¶ 85–86, 124-25.)

Pixels' next argument that the Hanes Transaction and Panini Settlement are insufficiently comparable to Pixels' conduct here misses the point of how Tregillis uses these two situations. (ECF No. 77 at 16:28–17:1.) Tregillis does not use the Hanes Transaction and Panini Settlement as comparable to this case for the purpose of hypothetical license analysis; rather, he uses them in a comparative analysis to determine the value of Jordan's rights when their use is not subject to any quality assurance or approval clauses. (Tregillis Report ¶¶ 124-25.)

---

[2] Pixels argues as a "preliminary matter" that the Hanes agreement and its revenue data were not produced prior to the close of discovery but were handed over two weeks after the discovery deadline. (ECF No. 77 at 13:13–22.) Upper Deck asserts that Pixels and its experts had time to consider this evidence before the deadline to file rebuttal reports, suggesting the delay was harmless. (ECF No. 100 at 17:12–13.) Pixels does not articulate any harm suffered in its briefs. (*See generally* Mot., Reply.) Thus, on this limited record, the Court finds that Upper Deck's failure to disclose was harmless; however, this determination is made without prejudice. *See* Fed. R. Civ. P. 37(c)(1).

Finally, Pixels argues that settlement agreements cannot be used as evidence to establish damages. (ECF No. 77 at 15:3-13.) This argument is contradicted by Ninth Circuit case law. *See, e.g.*, *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007) (upholding the district court's damages calculations based in part on a prior settlement agreement); *Carucel Invs., L.P. v. Novatel Wireless, Inc.*, 2017 WL 1215838, at *10–11 (S.D. Cal. Apr. 3, 2017) (recognizing that settlement agreements are relevant in determining reasonable royalty damages).

Accordingly, the Court finds Tregillis's methodology, including the premium multiplier, as well as the facts and data underlying that methodology to be reliable and relevant to the task at hand. *See Daubert*, 509 U.S. at 597.

### B.     The "Evidence Indicates" Opinions

In addition to his opinions on the economic harm to Upper Deck and Jordan and the revenues earned by Pixels, Tregillis offers two "Evidence Indicates" opinions. First, "Evidence indicates that, as Upper Deck values its relationship with Jordan, one of the world's most iconic athletes and personalities, Upper Deck protects both its rights and Jordan's rights, while also ensuring it only produces and/or approves high-quality products that feature appropriate and value-enhancing uses of Jordan's rights of publicity and trademarks." (Tregillis Report § 1.1.) And second, "Evidence indicates that the use made by Pixels is unauthorized and would not have been authorized by Jordan and/or Upper Deck." (*Id.*) Pixels argues these opinions are irrelevant and should be excluded. (ECF No. 77 at 21:8-12.)

Expert testimony is relevant if it is sufficiently tied to the facts of the case such that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *See Daubert*, 509 U.S. at 591 (citation modified). The Ninth Circuit has found expert testimony is relevant if it "logically advances a material aspect of the proposing party's case." *Daubert*, 43 F.3d at 1315; *see also Primiano*, 598 F.3d at 565 ("Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." (citation modified)).

Pixels primarily argues that the "Evidence Indicates" opinions are irrelevant because they assert facts favorable to Upper Deck that are not relevant to assisting the jury, and as such, they should be excluded under Federal Rules of Evidence 702 and 403. (ECF No. 77 at 21:8-12.) However, the Court finds that the two "Evidence Indicates" opinions will aid the jury in understanding Tregillis's hypothetical license analysis. The "Evidence Indicates" opinions shed light on the fair market value of Jordan's rights as Pixels used them and demonstrate the necessity of the premium multiplier. More specifically, the opinions will help the jury to understand how Upper Deck and Jordan value Jordan's rights and typically license them. Hence, the Court finds that these opinions are relevant for the jury's consideration and fall within the scope of Tregillis's expert testimony. *See Daubert*, 43 F.3d at 1315; *Primiano*, 598 F.3d at 565.

Pixels also seems to raise an objection to the "Evidence Indicates" opinions under Federal Rule of Evidence 704, arguing the second opinion "is a naked attempt to elevate Upper Deck's allegations of unauthorized use by Pixels into a liability opinion against Pixels." (*See* ECF No. 77 at 23:18-20.) Upper Deck responds by asserting that "Tregillis is not testifying about 'authorization' in a liability sense (he assumes this as all damages experts do . . .), but rather that the use Pixels made would not have been contractually approved or authorized by Jordan because of the images used and types of products sold. This goes to brand standards, not liability." (ECF No. 100 at 22:20-24.)

Under Federal Rule of Evidence 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Rather, the basic approach to opinions is to admit them when helpful to the trier of fact. Fed. R. Evid. 704 advisory committee's notes. Experts may not, however, offer opinions embodying legal conclusions. *See id.* (clarifying Rule 704 as not permitting "the admission of opinions which would merely tell the jury what result to reach").

Here, the Court agrees that Tregillis's second "Evidence Indicates" opinion goes to brand standards and addresses how the fair market value of Jordan's rights is impacted when subject to quality assurance and approval clauses. This opinion lays the foundation

for Tregillis's use of the premium multiplier to account for the fact that Pixels' use of Jordan's rights was not subject to quality assurance or approval clauses. Consequently, the opinion is relevant and helpful to the trier of fact in understanding Tregillis's hypothetical license analysis. *See id.*

However, grounding the second "Evidence Indicates" opinion in language about "authorization" toes the line of embodying a legal conclusion. Accordingly, while the Court finds that Tregillis is not offering a legal conclusion, his testimony at trial should make clear, as Upper Deck avers, that Tregillis is merely assuming Pixels' liability for the purposes of his analysis and is offering opinions about authorization solely to support his damages analysis, not to offer a legal conclusion. (*See* ECF No. 100 at 22:20-24.) Any lingering doubts as to the negative impact of Tregillis's testimony can be managed by instructing the jury to follow only the judge's instructions as to what the law is and to disregard any testimony that is inconsistent with those instructions. *See, e.g., Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1371 (10th Cir. 1977) (upholding admission of expert testimony on general principles of trademark law because the "court specifically cautioned the jury before the expert testified and again in its instructions that the jury was to disregard any of the expert's testimony that was inconsistent with the court's instructions").

## IV. CONCLUSION

Based on the foregoing, the Court **DENIES** Pixels' motion to exclude the testimony of Upper Deck's expert. (ECF No. 77.) The Court finds Christian Tregillis is duly qualified to render his expert opinion, and his methodology is sufficiently reliable and relevant for admission.

**IT IS SO ORDERED.**

**DATED: December 9, 2025**

Hon. Cynthia Bashant, Chief Judge
United States District Court