## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

THE UPPER DECK COMPANY,

Plaintiff,

v.

PIXELS.COM, LLC,

Defendant.

Case No. 24-cv-00923-BAS-DEB

**AMENDED[1] ORDER:**
   **(1) GRANTING IN PART, DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 74); AND**

   **(2) GRANTING IN PART, DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 79)**

Presently before the Court are Defendant Pixels.com, LLC's ("Pixels") motion for summary judgment (ECF No. 74) and Plaintiff The Upper Deck Company's ("Upper Deck") motion for summary judgment (ECF No. 79). For the reasons below, the Court

---

[1] The Court recognized that in its prior order, it inadvertently stated it "GRANTS" Pixels' motion for summary judgment and "DENIES" Upper Deck's motion for summary judgment as to Pixels' Section 230 defense to the extent Upper Deck seeks to hold Pixels accountable for selling and distributing physical prints containing the images at dispute in this action. (ECF No. 186 at 58–59.) The Court intends to hold the opposite and indeed, the conclusion section of the prior order indicates as much. (*Id*. at 60.) As such, the Court corrects its scrivener's error in this Amended Order.

- 1 -

**GRANTS IN PART** and **DENIES IN PART** both Parties' summary judgment motions. (ECF Nos. 74, 79.)

## I.      BACKGROUND

Upper Deck is a manufacturer of sports memorabilia (including sports player trading cards), and has exclusive licensing agreements with various athletes, including famous basketball player Michael Jordan ("Jordan"), to use their names, images, and likenesses. (ECF No. 24 ¶¶ 5, 13–24.)  Pixels is an online company, selling print-on-demand décor, photographs, wall art, prints, and other similar products online throughout the United States through its websites, including www.pixels.com, www.designerprints.com, and www.fineartamerica.com.  (ECF No. 90 at 12:22-24.)

Upper Deck argues it has exclusive rights to use certain aspects of Jordan's likeness, including Jordan's image, Jordan's name, and Jordan's famous professional basketball jersey number "23".  (ECF No. 24 ¶ 42.)  Upper Deck's rights come from a licensing agreement with Jordan's company (Jump 23 Inc.), which grants Upper Deck the exclusive rights to create sports memorabilia with Jordan's likeness and the ability to sublicense those rights.  (ECF No. 117-1.)

Pixels' websites allow people to upload images and to sell physical prints of those images.  (ECF No. 117-17 ¶¶ 9–11, 14–15.)  Pixels' websites also allow people to search for images for which they wish to purchase prints.  (*Id*. ¶¶ 11, 17–19.)  Without authorization from Jordan, Jump 23, or Upper Deck, Pixels offered products containing Jordan's likeness for sale on its websites.  (ECF No. 24 ¶ 25.)  Upper Deck provides examples of products including framed prints of Upper Deck's trading cards featuring Jordan, among other prints displaying Jordan's likeness (*id*. ¶ 33):

24cv923



< PREV : NEXT >    ♡₀  ♡₀

**1997 Michael Jordan Rookie Card Framed Print**

by Wayne Taylor

Regular Price: $87.42
20% Off  (Sale Ends in 5 Hours)

**$70.00**    ADD TO CART

Show Price Details    Add to Favorites

Pay in 4 interest-free payments of $17.50 with PayPal. Learn more

Framed Print ♡

| PRINT SIZE | | SHAPE | |
|---|---|---|---|
| 7" x 10" | ♡ | Natural | ♡ |

FRAME

CRQ1s    ♡



**$56.00**    ADD TO CART

Show Price Details    Add to Favorites

Pay in 4 interest-free payments of $14.00 with PayPal. Learn more

Canvas Print ♡

| PRINT SIZE | | SHAPE | |
|---|---|---|---|
| 10" x 6.5" | ♡ | Natural | ♡ |

CANVAS WRAP

1.5" Stretcher Bars (Mirrored Sides)    ♡

| Frame | Top Mat | Bottom Mat | Dimensions | |
|---|---|---|---|---|
| None | None | None | Image:<br>Overall: | 10.80" x 6.50"<br>10.80" x 6.50" |




< PREV : NEXT >    ♡₂  ♡₀

**Michael Jordan Smiles Canvas Print**

by Retro Images Archive

Regular Price: $44.04
20% Off  (Sale Ends in 5 Hours)

**$35.23**    ADD TO CART

Show Price Details    Add to Favorites

Pay in 4 interest-free payments of $0.01 with PayPal. Learn more

Canvas Print ♡

| PRINT SIZE | | SHAPE | |
|---|---|---|---|
| 6.5" x 8" | ♡ | Natural | ♡ |

CANVAS WRAP

1.5" Stretcher Bars (Mirrored Sides)    ♡

CANVAS TYPE



24cv923



On March 26, 2024, Upper Deck brought this action against Pixels asserting that Pixels is selling products online featuring Jordan's likeness and Upper Deck's logo without authorization.  (ECF No. 1 ¶ 1.)  On May 28, 2024, Pixels removed the case from state court to this Court.  (*Id.*)

On October 1, 2024, Upper Deck filed the operative amended complaint (ECF No. 24), asserting causes of action for:

1.  (Count 1) false affiliation/endorsement, false advertising, and unfair competition (Lanham Act, 15 U.S.C. § 1125(a)) (ECF No. 24 ¶¶ 41–49);

2.  (Count 2) trademark dilution (Lanham Act, 15 U.S.C. § 1125(c)) (ECF No. 24 ¶¶ 50–55);

3.  (Count 3) registered trademark infringement (15 U.S.C. § 1114) (ECF No. 24 ¶¶ 56–61);

4.  (Count 4) deprivation of rights of publicity (Cal. Civ. Code § 3344) (ECF No. 24 ¶¶ 62–70);

5.  (Count 5) violation of rights of publicity under California common law (ECF No. 24 ¶¶ 71–76);

6.  (Count 6) violation of California's Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq*.) (ECF No. 24 ¶¶ 77–90); and

7.  (Count 7) unfair competition (ECF No. 24 ¶¶ 91–95).

24cv923

On October 15, 2024, Pixels filed an answer to the amended complaint, asserting seventeen affirmative defenses.  (ECF No. 28.)  On May 27, 2025, Pixels moved for summary judgment on all causes of action.  (ECF No. 74.)  On the same day, Upper Deck moved for partial summary judgment on several of Pixels' affirmative defenses.  (ECF No. 79.)

More specifically, Pixels brought its motion for summary judgment on the following grounds:

1. Upper Deck's trademark dilution claim (Count 2) related to the hologram mark fails because the mark is not famous (ECF No. 74 at 2:10-12);

2. Upper Deck's trademark infringement claim (Count 3) related to the hologram mark fails because there is no evidence showing likelihood of confusion (ECF No. 74 at 2:13-16);

3. Upper Deck's false endorsement and false advertising claims (Count 1) related to Michael Jordan's trademarks fail because Upper Deck lacks standing, cannot satisfy the elements of false advertising, and fails to provide any evidence of likelihood of confusion (ECF No. 74 at 2:17-21);

4. Upper Deck lacks standing to bring California right of publicity claims (Counts 4 and 5) on behalf of Michael Jordan (ECF No. 74 at 2:26-28);

5. Upper Deck's claim under California Business and Professions Code § 17200 (Count 6) fails because Upper Deck lacks standing, does not present an unlawful predicate act, and does not seek a remedy available by statute is available to Upper Deck (ECF No. 74 at 3:1-4);

6. Upper Deck's unfair competition cause of action (Count 7) fails because no evidence suggests the images uploaded to Pixel's website were being palmed off as Upper Deck's products (ECF No. 74 at 3:5-7);

7. A three-year statute of limitations limits the scope of Upper Deck's Lanham Act claims (Counts 1, 2, and 3) (ECF No. 74 at 3:8-10);

24cv923

8. A two-year statute of limitations limits Upper Deck's California state law claims (Counts 4, 5, 6, and 7) (ECF No. 74 at 3:11-13); and

9. Upper Deck's California state law claims (Counts 4, 5, 6, and 7) are pre-empted under the Communications Decency Act (ECF No. 74 at 2:22-25);

Additionally, Upper Deck moves for partial summary judgement on the following grounds (ECF No. 79):

1. Pixels does not use the marks (Affirmative Defense 2) (ECF No. 74 at 2:11-12);

2. Upper Deck's claims are not barred on grounds that Pixels' products are works of artistic expression under the First Amendment (Affirmative Defense 4) (ECF No. 74 at 2:13-15);

3. Upper Deck's claims are not barred on grounds that Pixels' products are transformative works (Affirmative Defense 6) (ECF No. 74 at 2:16-17);

4. There is a failure of condition precedent (Affirmative Defense 7) (ECF No. 74 at 2:18-20);

5. The harm was caused by contributors, not Pixels (Affirmative Defense 15) (ECF No. 74 at 2:23-25); and

6. The state law claims are barred by the Communications Decency Act (Affirmative Defense 8) (ECF No. 74 at 2:21-22).

The Court held oral argument on February 27, 2026. (ECF No. 184.)  Having heard Parties' arguments, the Court now rules on Parties' motions for summary judgment (ECF Nos. 74, 79.)

The Court first addresses Pixels' summary judgment motion on Upper Deck's causes of action.  (ECF No. 74.)  The Court then addresses Upper Deck's requests for summary judgment of Affirmative Defenses 2, 4, 6, 7, and 15.  (ECF No. 79.)  Lastly, since both Parties move for summary judgment on Affirmative Defense 8, the Court addresses it in a separate section.  (ECF Nos. 74, 79.)

## II.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id*. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

A party opposing a motion for summary judgment must set forth specific material facts showing a "genuine dispute" as to a "material fact." *See* Fed. R. Civ. P. 56(a), (c)(1). If the moving party meets the initial burden of establishing the absence of material fact, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) (citing *Anderson*, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient"). Rather, the nonmoving party must "go beyond the pleadings and by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

24cv923

showing that there is a genuine issue for trial.' " *Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

At the summary judgment stage, the Court may reasonably consider the evidence presented by the parties and determine the extent to which it is relevant. It need not take judicial notice in order to consider the documents. *See Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, 488 F. Supp. 3d 892, 896 (N.D. Cal. 2020).

## III.    PIXELS' MOTION FOR SUMMARY JUDGMENT (ECF No. 74)

### A.    Lanham Act

Upper Deck brings the following causes of action under the Lanham Act: trademark dilution (Lanham Act, 15 U.S.C. § 1125(c)) (Count 2); registered trademark infringement (15 U.S.C. § 1114) (Count 3); and false affiliation/endorsement, false advertising, and unfair competition (Lanham Act, 15 U.S.C. § 1125(a)) (Count 1). (ECF No. 24 ¶¶ 41–61.) Pixels moves for summary judgment on Upper Deck's Lanham Act causes of action. (ECF No. 74 at 2:10-21.)

#### 1.    Trademark Dilution (Lanham Act, 15 U.S.C. § 1125(c)) (Count 2)

Upper Deck asserts a cause of action for trademark dilution under 15 U.S.C. § 1125(c), regarding Pixels' use of Upper Deck's trademarks that make up Upper Deck's logo hologram design ("Upper Deck Hologram Mark") (ECF No. 24 ¶¶ 10, 50–55, ECF No. 90 at 16:22-24). The Upper Deck Hologram Mark is registered with the United States Patent and Trade Office ("USPTO"), at USPTO No. 2710652. (ECF No. 117 at 8:15-20.)

24cv923

Pixels moves for summary judgment[2] on Upper Deck's trademark dilution cause of action on the basis that its registered hologram mark is not sufficiently famous.  (ECF No. 74 at 2:10-12.)

To prove a claim for dilution, "a plaintiff must show that . . . the mark is famous and distinctive."  *See Jada Toys, Inc.*, 518 F.3d at 634.  15 U.S.C. § 1125(c)(2)(A) provides a list of four factors that a court may consider to determine the degree of fame a mark retains: (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; and (iv) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.  *Id.*

Applying these provisions, the Ninth Circuit has concluded that trademark dilution "is a cause of action reserved for a select class of marks—those marks with such powerful consumer associations that even noncompeting uses can impinge on their value."  *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004).  "[D]ilution protection [extends] only to those whose mark is a household name."  *Id*.  "Courts have described dilution fame as difficult and demanding requirement,"  *United Tactical Sys., LLC v. Real Action Paintball, Inc.*, No. 14-cv-04050-MEJ, 2014 WL 6788310, at *20 (N.D. Cal. Dec. 2, 2014), and "difficult to prove,"  *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373-76 (Fed. Cir. 2012) ("[T]he burden to show fame in the dilution context is high—and higher than that for likelihood of confusion purposes.").  As such, any one of the factors in § 1125(c)(2)(A) may militate against finding that the Upper Deck Hologram Mark is sufficiently famous for a trademark dilution claim.

---

[2] Whether a defendant's mark creates a likelihood of dilution is a factual question generally not appropriate for decision on summary judgment.  *See Visa Int'l Serv. Ass'n v. JSL Corp.*, 610 F.3d 1088, 1090 (9th Cir. 2010) (citing *Jada Toys, Inc., Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008)).  Nevertheless, summary judgment may be granted in a dilution case, as in any other, if no reasonable factfinder "could fail to find a likelihood of dilution."  *Id.*

24cv923

"Actual recognition of the mark" under § 1125(c)(2)(A)(iii) requires that the plaintiff allege national recognition by the general public and not simply recognition in a "specialized or niche" market.[3] *See Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, 963 F.3d 859, 869–70 (9th Cir. 2020) ("[N]iche fame can no longer make a trademark eligible for protection against dilution; instead, the trademark must be 'widely recognized by the general consuming public of the United States'"); *see also Stone Brewing Co., LLC v. MillerCoors LLC*, 445 F. Supp. 3d 1113, 1147 (S.D. Cal. 2020) ("While the evidence here shows more than a decade of extensive fan following and sales . . . of Stones craft beers bearing the STONE® mark . . . since it was first introduced, it does not show the STONE® mark attained the requisite level of nationwide fame among the general population as opposed to a niche following among craft beer fans."). For example, the Ninth Circuit has determined that "Tiffany," "Polaroid," "Rolls Royce," "Kodak," and "Oscar" are marks with the requisite fame capable of dilution. *See Fruit of the Loom, Inc. v. Girouard*, 994 F.2d 1359, 1362-64 (9th Cir. 1993) (finding that the "Fruit" mark "is far from being in the class" of the listed marks).

Courts have already found that the Upper Deck Hologram Mark is not sufficiently famous among the general public to establish "actual recognition" as part of trademark dilution. *See e.g.*, *Upper Deck Co. v. Flores*, 569 F. Supp. 3d 1050, 1066–67 (S.D. Cal. 2021) (finding against actual recognition where "Upper Deck Trademarks are merely . . . famous in the niche market of trading card collectors" rather than "widely recognized by the general consuming public of the United States" required by 15 U.S.C. § 1125(a)(2)(A)). In addition, though Upper Deck claims its mark is recognized by "sports memorabilia collectors," sports memorabilia collectors are not representative of the "general consuming

---

[3] Though the Ninth Circuit historically found that fame within a niche market may be entitled to some protection under certain circumstances, those cases largely pre-date *Blumenthal*, 963 F.3d 859. *See e.g.*, *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 877 (9th Cir. 1999) ("[F]ame in a localized trading area may meet" the famousness requirement); *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 908 (9th Cir. 2002) (The Lanham Act "protects a mark only when a mark is famous within a niche market *and* the alleged diluter uses the mark within that niche").

public" and instead represent a relatively niche "hobby market." *Blumenthal*, 963 F.3d at 869–70. Moreover, Upper Deck has not introduced any surveys of the general public indicating "widespread brand awareness." *See Idaho Golf Partners, Inc. v. TimberStone Mgmt., LLC.*, No. 1:14-CV-00233-BLW, 2017 WL 3531481, at *6 (D. Idaho Aug. 17, 2017) ("Survey evidence or market research demonstrating widespread brand awareness, or the lack thereof, weighs heavily in determining a mark's fame" under § 1125(c)(2)(A)(iii).); *see also* 3 McCarthy on Trademarks and Unfair Competition § 24:106 (5th ed.) (noting that § 1125(c)(2)(A)(iii) requires a "rigorous and demanding test," and a "minimum threshold survey response should be in the range of 75% of the general consuming public of the United States."). Based on the above, Pixels has met its initial burden to move for summary judgment on Upper Deck's trademark dilution claim.

It is true that Upper Deck has presented evidence that it registered the Upper Deck Hologram Mark, used the Upper Deck Hologram Mark in connection with national and international sales for decades, and maintained a consistent sales record. (*See* ECF No. 90 at 15:2-4, 15:23–16:9.) However, the Ninth Circuit has found that in absence of evidence that "consumers in general" have brand association due to plaintiff's trademark, plaintiff's "substantial sums [spent] annually advertising [its] mark, with some presumable degree of success due to [plaintiff's] significant annual volume of sales" is insufficient to establish a finding of fame. *Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 873–75 (9th Cir. 1999) (finding plaintiff has failed to establish requisite fame for its trademark dilution claim "despite decades of use, $3 billion in annual sales, and $5 million in advertising[.]"); *see also Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 969 (N.D. Cal. 2019) (applying *Avery Dennison Corp.*, 189 F.3d at 873–75 to find plaintiff failed to establish its mark is sufficiently famous despite evidence of commercial success); *see also Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334, 1364–65 (E.D. Cal. 2019) (despite "extensive advertisement and sales of Monster's line of energy drinks bearing the Claw Icon over more than a decade prior to defendant's first use," plaintiff does

not show "the Claw Icon attained the requisite level of nationwide fame among the general population" necessary to obtain summary judgment). This Court agrees.

Given that Upper Deck has not presented adequate evidence that its marks could meet the "actual recognition" requirement in § 1125(c)(2)(A)(iii), Upper Deck has failed to meet its burden to designate "specific facts showing that there is a genuine issue for trial'"—even construing the evidence in Upper Deck's favor. *See Celotex*, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).

Thus, the Court **GRANTS** Pixels' request for summary judgment as to Upper Deck's trademark dilution cause of action. (ECF No. 74 at 2:10-12.)

### 2. Registered Trademark Infringement (Lanham Act, 15 U.S.C. § 1114) (Count 3)

Upper Deck asserts that Pixels had used Upper Deck's "registered marks" in "connection with the sale, offering for sale, distribution, or advertising of its memorabilia, photographs, and collectibles," as part of its cause of action for registered trademark infringement (15 U.S.C. § 1114) (Count 3). (ECF No. 24 ¶¶ 56–62.) More specifically, Upper Deck alleges Pixels misused the Upper Deck Hologram Mark in the products offered on its website. (*See id*.) Pixels moves for summary on Upper Deck's trademark infringement cause of action on the basis that Upper Deck cannot demonstrate likelihood of confusion. (ECF No. 74 at 2:13-15.)

To succeed on a trademark infringement claim under 15 U.S.C. § 1125(a)(1)(A), a plaintiff must demonstrate: (1) ownership of a trademark, and (2) a likelihood of consumer confusion through a balancing of eight factors. *Wells Fargo & Co. v. ABD Ins. & Financial Services, Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014) (citing eight factors discussed in *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348-49 (9th Cir. 1979)).

In determining whether consumer confusion between related goods is likely, the following factors are relevant: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's

24cv923

intent in selecting the mark; and (8) likelihood of expansion of the product lines. *Sleekcraft,* 599 F.2d at 348-49. In the Internet context, courts must be flexible in applying the factors, as some may not apply. *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004).

Here, Parties do not dispute Upper Deck's ownership of the Upper Deck Hologram Mark. Upper Deck has presented evidence of trademark registration and use in commerce (ECF No. 24 ¶¶ 10–11), which Pixels does not dispute (ECF No. 117 at 14:12-18). *See Rearden, LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012) ("The party claiming ownership must have been the first to actually use the mark in the sale of goods or services . . . it is not enough to have invented the mark first or even to have registered it first."). Pixels moves for summary judgment of Upper Deck's trademark infringement claim on the basis that the Pixels' use of the Upper Deck Hologram Mark is not likely to confuse consumers. (ECF No. 117 at 16:9–17:24.) Accordingly, the Court focuses its analysis on the eight *Sleekcraft* factors for determining likelihood of consumer confusion.

### i. Strength of the Mark

Stronger marks are afforded greater protection from infringing uses. *See Sleekcraft Boats,* 599 F.2d at 349. To determine the relative strength of a trademark, courts examine: (1) the conceptual strength (how the mark is classified) and (2) the commercial strength (marketplace recognition value of the mark). *See GoTo.com v. Walt Disney Co.,* 202 F.3d 1199, 1207 (9th Cir. 2000); *Brookfield Comm'ns v. W. Coast Ent. Corp.,* 174 F.3d 1036, 1058 (9th Cir. 1999).

Trademarks that "require[] an ordinary consumer to use some imagination in connecting the marks with the products" are conceptually strong. *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1033 (N.D. Cal. 2009) (referencing *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir. 1987)).

A conceptually weak mark may be strengthened by its commercial strength, demonstrated by factors such as "advertising, length of exclusive use, [and] public recognition." *Entrepreneur Media v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002).

24cv923

Registration with the United States Patent and Trademark Office ("USPTO") can be evidence of a mark's strength. *See The Coca–Cola Company v. Overland, Inc.,* 692 F.2d 1250, 1254 (9th Cir. 1982) (registered marks are entitled to "the specific presumption that [it] is not generic" which defendant has the burden to oppose). Further, continuous use of registered marks for at least five years also favors the mark's overall strength. *See Park 'N Fly, Inc. v. Dollar Park & Fly, Inc*., 469 U.S. 189, 205 (1985) (incontestable marks under 15 U.S.C. § 1065(3) are registered marks that have been in continuous use for at least five years; and incontestable marks are conceptually strong).

Here, Parties dispute the commercial strength of the Upper Deck Hologram Mark. (*See* ECF Nos. 90 at 15:2-4, 15:24–16:2; 117 at 17:8-14.) More specifically, Pixels argues that Upper Deck does not demonstrate that Pixels' consumers have recognized the Upper Deck Hologram Mark, or that Pixels' consumers purchased products online containing the Upper Deck Hologram Mark. (ECF No. 117 at 17:8-14.) However, Upper Deck presents other evidence of its commercial success. For example, Upper Deck has registered the Upper Deck Hologram Mark and used the Upper Deck Hologram Mark in connection with sales for more than twenty years, including in selling Jordan-related trading cards nationally and internationally. (ECF No. 90 at 15:2-4, 15:24–16:2.)[4] Construing the evidence in favor of Upper Deck, a reasonable jury could conclude the Upper Deck Hologram Mark is commercially strong.

Since the Upper Deck Hologram Mark is strong, the first *Sleekcraft* factor favors finding likely consumer confusion. *Sleekcraft,* 599 F.2d at 348–49.

### iii. Proximity of the Goods

---

[4] The Upper Deck Hologram Mark can be commercially strong based on its investment and success in a niche market, even if it is not sufficiently famous to meet the standard of fame for trademark dilution. *See e.g.*, *Monster Energy Co. v. BeastUp LLC*, 395 F. Supp. 3d 1334, 1353, 1364 (E.D. Cal. 2019) (finding plaintiff's claw icon to be commercially strong for purposes of trademark infringement given its use throughout plaintiff's extensive advertising efforts, but insufficiently famous beyond a niche market of energy drink consumers for purposes of trademark dilution).

- 14 -

24cv923

"Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods." *Brookfield Commc'ns*, 174 F.3d at 1055 (citing *Official Airline Guides*, 6 F.3d at 1392). "For related goods, the danger presented is that the public will mistakenly assume there is an association between the producers of the related goods, though no such association exists." *Sleekcraft*, 599 F.2d at 350. In addressing this factor, the Court focuses on whether the consuming public is likely to somehow associate defendant's products with plaintiff. *Brookfield Commc'ns*, 174 F.3d at 1056; 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 24:24 (5th ed. 2017) ("Goods are 'related' if customers are likely to mistakenly think that the infringer's goods come from the same source as the senior user's goods or are sponsored by, affiliated with or connected with the senior user.").

Given that Parties both offer sports memorabilia containing the same intellectual property assets (*i.e.*, the Upper Deck Hologram Mark) for sale (ECF Nos. 24 ¶ 36, 117 at 17:10-15), the second *Sleekcraft* factor also favors a finding of likely confusion. *Sleekcraft,* 599 F.2d at 348–49.

### iv.     Similarity of the Marks

The similarity of the marks "has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com, Inc.*, 202 F.3d at 1205. The greater the similarity between the two marks, the greater the likelihood of confusion. *Id.* at 1206. "Similarity of the marks is tested on three levels: sight, sound, and meaning." *Sleekcraft*, 599 F.2d at 351. The Ninth Circuit has "developed three axioms that apply to the 'similarity' analysis: 1) Marks should be considered in their entirety and as they appear in the marketplace; 2) Similarity is best adjudged by appearance, sound, and meaning; and, 3) Similarities weigh more heavily than differences." *Entrepreneur*, 279 F.3d at 1144.

Given that the infringing products on Pixels' website used the exact same mark as its Upper Deck Hologram Mark (ECF Nos. 24 ¶ 36, 117 at 17:10-15), the third *Sleekcraft* factor also favors finding likely consumer confusion. *Sleekcraft,* 599 F.2d at 348-49.

### v.     Evidence of Actual Confusion

- 15 -

24cv923

"A showing of actual confusion among a significant number of consumers provides strong support for the likelihood of confusion" in the online context. *Playboy Enters., Inc.*, 354 F.3d at 1026.

Pixels claims that Upper Deck does not provide any evidence of actual confusion regarding Pixels' use of the Upper Deck Hologram Mark, and cites Upper Deck's response to Pixels' interrogatory stating that Upper Deck has not received any reports from consumers stating they were confused. (ECF Nos. 117 at 17:15-18, 117-19 at 3:26–4:2.) Pixels further argues that the one product containing the Upper Deck Hologram Mark listed on its website was never actually sold. (*Id*. at 17:14). On the other hand, Upper Deck asserts "it is unavoidable that consumers would see Upper Deck's Hologram mark in association with an image of the 1986-87 Fleer Michael Jordan Rookie Card and believe that Upper Deck created or authorized the image." (ECF No. 90 at 17:27–18:2.) Below is the framed print of the 1986-87 Fleer Michael Jordan Rookie Card offered for sale on Pixels' website containing the Upper Deck Hologram Mark that is at dispute (*see id*. ¶ 36, 117-3 (red circle added to highlight Upper Deck Hologram Mark)):




24cv923

Because both Parties used the same Upper Deck Hologram Mark to sell products prominently featuring the same image (*e.g.*, the "1986-87 Fleer Michael Jordan Rookie Card") (ECF Nos. 24 ¶ 36, 117 at 17:10-15), the surrounding context implies likely consumer confusion. *See Jevo Inc. v. Barre Physique LLC*, No. CV-08-06315-R, 2010 WL 11597823, at *19 (C.D. Cal. Feb. 22, 2010) (citing 3 McCarthy on Trademarks and Unfair Competition § 23:63 (5th ed.)) (finding actual confusion based on an "argument based on an inference arising from a judicial comparison of the conflicting marks themselves and the context of their use in the marketplace"); *see also Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1094 (N.D. Cal. 2014) (citing *Interstellar Starship Services, Ltd. v. Epix, Inc.,* 304 F.3d 936, 941 (9th Cir. 2002)) ("Initial interest confusion occurs when the defendant uses the plaintiff's trademark in a manner calculated to capture initial consumer attention, even though no actual sale is finally completed as a result of the confusion"); *see also Rodeo Realty, Inc. v. Santangelo*, No. CV1108372RGKAGRX, 2012 WL 13012469, at *3 (C.D. Cal. June 14, 2012) (citing *M2 Software, Inc. v. Madacy Entm't Corp.*, 421 F.3d 1073, 1089 (9th Cir. 2005)) ("[T]here is no need to show that actual customers were confused. Rather, the confusion can take place with potential buyers").

Thus, the Court finds that the fourth *Sleekcraft* factor also favors finding likely confusion. *Sleekcraft,* 599 F.2d at 348–49.

### vi.   Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353. Here, both Upper Deck's and Pixels' products are sold online on different websites. (*See* ECF No. 117 at 21.)

Although Upper Deck's and Pixels' products are sold on different websites, the facts that both Parties' products display the Upper Deck Hologram Mark militate toward finding likely consumer confusion. *See e.g.*, *K-Swiss, Inc. v. USA AISIQI Soes Inc.*, 291 F. Supp. 2d 1116, 1124 (C.D. Cal. 2003) ("The similarity in marks may still lead consumers to believe that K-Swiss has created its own 'value' line of shoes sold in discount shoe stores.").

- 17 -

24cv923

Next, the Ninth Circuit has recognized that "[t]oday, it would be the rare commercial retailer that did not advertise online, and the shared use of [the Internet] does not shed much light on the likelihood of consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1151 (9th Cir. 2011); *see also Playboy Enters., Inc.*, 354 F.3d at 1028 (noting that the marketing channels factor is "equivocal" where the parties both used the Internet because "[g]iven the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight.").

Accordingly, the fifth *Sleekcraft* factor weighs very slightly in favor of likelihood of confusion.

### vii.    Degree of Care Exercised by Purchaser

"In analyzing the degree of care that a consumer might exercise in purchasing the parties' goods, the question is whether a 'reasonably prudent consumer' would take the time to distinguish between the two product lines." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) (citing *Brookfield Comm., Inc. v. West Coast Entertainment Corp.,* 174 F.3d 1036, 1060 (9th Cir. 1999)).   In determining the degree of care likely to be exercised by the purchaser, courts look both at the relative sophistication of the relevant consumer and the cost of the item. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037–38 (9th Cir. 2010) (relative sophistication); *Brookfield Commc'ns*, 174 F.3d at 1060 (cost of item).

The "reasonably prudent consumer" is expected "to be more discerning—and less easily confused—when he is purchasing expensive items." *Id.* "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Id.*

Here, Parties agree the Upper Deck Hologram Mark is well known amongst sports memorabilia collectors.  Upper Deck's expert testified that the Upper Deck Hologram Mark is "very recognizable" to trading card collectors and even, to all collectors of sports memorabilia.  (ECF No. 90-3 at 8:16–9:4.)   Both Parties cite this testimony in their summary judgment briefing.  (*See* ECF Nos. 90 at 16:10-14, 117 at 17:18-20.)  Thus, the

24cv923

"relative sophistication of the relevant consumer" (*i.e.*, consumers of Upper Deck's trading cards), *Fortune Dynamic*, 618 F.3d at 1038, indicates that the average Upper Deck trading card consumer is likely to exercise greater care in purchasing Upper Deck's trading cards.

Moreover, Upper Deck admits that there is a gap between the cost of its trading cards and the framed print of the 1986-87 Fleer Michael Jordan Rookie Card, which makes consumer confusion less likely (*see* ECF No. 90 at 18:4-7) ("Customers would not expect such image to carry the same sales price as the actual trading card itself.")).  Further, public weblinks demonstrate that a copy of the 1986-87 Fleer Michael Jordan Rookie Card was sold at an auction for $840,000.  (*See* ECF No. 90 at 17:24-25 (citing https://www.beckett.com/news/1997-98-upper-deck-game-jersey-autograph-michael-jordan-nets-840000/).)  Meanwhile, the framed print of the 1986-87 Fleer Michael Jordan Rookie Card offered for sale on Pixels' website was priced at $70.  (ECF No. 24 ¶ 33.)  The fact that Upper Deck's products (*e.g.*, the 1986-87 Fleer Michael Jordan Rookie Card) can be significantly more expensive than Pixels' copycat products (*e.g.*, the framed print of the 1986-87 Fleer Michael Jordan Rookie Card) militates against consumer confusion.  *Cf Brookfield Communications, Inc.,* 174 F.3d at 1059 ("As a rule of thumb, consumers are expected to be more discerning and less easily confused when the products in question are expensive items . . . Defendants' kits sell for over $10,000, and plaintiff's are considerably more.").

For the reasons above, this *Sleekcraft* factor weighs against finding likelihood of consumer confusion.

### viii.   Intent in Selecting Mark

While "not required for a finding of trademark infringement," *Brookfield Commc'ns*, 174 F.3d at 1059, "[w]hen an alleged infringer knowingly adopts a mark similar to another's, courts will presume an intent to deceive the public." *Official Airline Guides*, 6 F.3d at 1394 (citing *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992)).  The Ninth Circuit has "emphasized the minimal importance of the intent factor" in the likelihood of confusion analysis. *Marketquest Grp., Inc. v. BIC Corp.*, 316

24cv923

F. Supp. 3d 1234, 1274 (S.D. Cal. 2018) (citing *GoTo.com, Inc.*, 202 F.3d at 1208). "This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Marketquest Grp., Inc*, 316 F. Supp. 3d at 1274 (citing *Brookfield Commc'ns, Inc.*, 174 F.3d at 1059).

Here, Pixels claims that it "does not select or upload any images to the Pixels websites" and it does not have any "intent to use the hologram mark." (ECF No. 117 at 17:15-18.) Thus, Pixels has met its initial burden regarding this *Sleekcraft* factor.

Evidence that could demonstrate, instead, Pixels did know about the Upper Deck Hologram Mark at the time it was used in products offered for sale on Pixels' website include: (1) cease-and-desist letters from Upper Deck from 2022, to which Pixels responded (ECF Nos. 79-9, 79-10), and (2) Pixels' websites' policies, implementing since at least 2014, a notice-and-takedown procedure for owners of intellectual property to notify Pixels—who then sends notifications to a designated third-party DMCA agent to review the takedown request. (ECF No. 117-17 ¶¶ 22–23.)

First, the cease-and-desist letter that Upper Deck sent to Pixels on November 2, 2022 describes Pixels' use of Jordan's "name, image, persona, and likeness"—but does not discuss Pixels' use of Upper Deck's trademarks. (ECF No. 79-9.) Since Upper Deck's trademark infringement cause of action hinges upon Pixels' use of the Upper Deck Hologram Mark, not Pixels' use of Jordan's trademarks or likeness,[5] the Court finds the cease-and-desist letters do not indicate intent by Pixels to use the Upper Deck Hologram Mark.

Second, courts within the Ninth Circuit have found the existence of notice-and-takedown procedures indicates website operators' knowledge and awareness of intellectual property infringement. *Cf Paramount Pictures Corp. v. Does*, No. 2:21-CV-09317-MCS-SK, 2022 WL 2189633, at *4 (C.D. Cal. Apr. 20, 2022), *modified*, No. 2:21-CV-09317-

---

[5] The Court also notes that the Pixels' misuse of the Jordan Marks is not always accompanied by Pixels' misuse of the Upper Deck Hologram Mark—including a few of the products in Upper Deck's amended complaint. (*See* ECF No. 24 ¶ 33.)

24cv923

MCS-SK, 2022 WL 17886018 (C.D. Cal. Aug. 26, 2022) (finding constructive knowledge where defendant system operator moderates its content to prevent copyright infringement). However, the mere existence of notice-and-takedown policy does not indicate that Pixels has knowledge about the infringing use of the Upper Deck Hologram Mark in particular. *Cf A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001), *as amended* (Apr. 3, 2001), *aff'd sub nom. A&M Recs., Inc. v. Napster, Inc.*, 284 F.3d 1091 (9th Cir. 2002) ("[I]f a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement."). For instance, Upper Deck has not indicated it attempted to take advantage of Pixels' notice-and-takedown procedure to notify Pixels' DMCA agent as to Pixels' infringing use of the Upper Deck Hologram Mark.

Thus, even when construing the evidence in favor of Upper Deck, the seventh *Sleekcraft* factor analysis weighs against finding likely consumer confusion. However, the Court notes that the intent factor is afforded minimal importance in the *Sleekcraft* analysis. *See Brookfield Commc'ns, Inc.*, 174 F.3d at 1059.

### ix.      Likelihood of Expansion of Product Lines

"[A] 'strong possibility' that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. When, however, the parties "already compete to a significant extent," as they do here, this factor is "relatively unimportant" to the likelihood of confusion analysis. *Brookfield Commc'ns*, 174 F.3d at 1060; *see also Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1275 (S.D. Cal. 2018). Neither party has submitted evidence of planned expansion. Therefore, this factor is neutral.

### x.      Result of *Sleekcraft* Analysis

In sum, the Court finds five *Sleekcraft* factors favor likely consumer confusion. The Court finds two factors—degree of care exercised by the relevant purchasers and Pixels' intent in selecting the mark—do not favor finding likely consumer confusion. Of those, courts have held intent in selecting the mark is minimally important. *See Marketquest*

24cv923

*Grp., Inc.*, 316 F. Supp. 3d at 1274.  The remaining *Sleekcraft* factor—likelihood of expansion of product lines—is neutral.

On balance, analysis of the *Sleekcraft* factors implies triable issues remain as to likelihood of consumer confusion via Pixels' misuse of the Upper Deck Hologram Mark. The crux of the matter is that Pixels has offered products bearing the Upper Deck Hologram Mark—including nearly exact replicas of Upper Deck's products—for sale on its website. Accordingly, the Court **DENIES** Pixels' motion for summary judgment as to Upper Deck's cause of action for trademark infringement.  (ECF No. 74 at 2:13-15.)

### 3.    False Advertising, False Affiliation/Endorsement, and Unfair Competition (Lanham Act, 15 U.S.C. § 1125(a))[6] (Count 1)

Upper Deck brings Lanham Act false advertising and false affiliation claims under 15 U.S.C. § 1125(a) for Pixels' advertisement and sale of products displaying Jordan's trademarks on its website.  (*See* ECF No. 24 ¶¶ 41–49.)  Pixels moves for summary judgment on Upper Deck's false advertising and false affiliation claims on the bases that: (1) Upper Deck cannot demonstrate standing to pursue them; and (2) Upper Deck cannot satisfy the elements of its false advertising claim or show a likelihood of confusion necessary for its false affiliation/endorsement claim.  (ECF No. 74 at 2:16-21.)

#### i.    False Advertising

#### a.    Standing

The United States Supreme Court determined that a plaintiff seeking to pursue Lanham Act false advertising claims under 15 U.S.C. § 1125(a)(1)(B) ("§ 1125(a)(1)(B)") must demonstrate statutory standing beyond the typical Article III requirements. *Bobbleheads.com, LLC v. Wright Bros., Inc.*, 259 F. Supp. 3d 1087, 1097 (S.D. Cal. 2017) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125–26 (2014)).

---

[6] Parties do not directly address Upper Deck's unfair competition claims under the Lanham Act in their summary judgment briefing.  Thus, the Court directs its analysis towards Upper Deck's false advertising and false affiliation/endorsement claims.

24cv923

There are two requirements for plaintiff to demonstrate standing for a false advertising claim under § 1125(a)(1)(B): (1) the claim falls within the "zone of interests" protected by the Lanham Act; and (2) plaintiff's injuries were proximately caused by violation of the Lanham Act—meaning plaintiff must claim an economic or reputational injury flows directly from the deception wrought by the defendant's conduct violative of the Lanham Act. *Bobbleheads.com, LLC.*, 259 F. Supp. 3d at 1097 (citing *Lexmark Int'l, Inc.*, 572 U.S. at 125–26).

### 1.    Commercial Interest for § 1125(a)(1)(B) Claims

For false advertising claims, the Supreme Court in *Lexmark* interpreted the Lanham Act to find that false advertising causes of action were created to protect Lanham Act's stated purpose of protecting against unfair competition. *Lexmark Int'l, Inc.*, 572 U.S. at 131 ("a typical false-advertising case will implicate only the Act's goal of "protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition."). In doing so, *Lexmark* explicitly narrowed the scope of potential plaintiffs who could bring false advertising claims. *Lexmark Int'l, Inc.*, 572 U.S. at 132. For example, *Lexmark* precludes deceived consumers from bringing claims against businesses for false advertising. *Id*. ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act"). Accordingly, a plaintiff can state a false advertising claim relates to unfair competition through evincing: (1) "lost sales and damage to its business reputation" and, (2) plaintiff is a "perso[n] engaged in . . . commerce within the control of Congress" whose position has been damaged by defendant. *Id*. at 137.

Here, Upper Deck clearly brings its false advertising claim as "a person engaged in commerce," and not as a deceived consumer. *See id*. Next, Upper Deck does not need to demonstrate an actual loss of sales to show sufficient injury for § 1125(a)(1)(B) standing, even at the summary judgment stage. *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1116 (S.D. Cal. 2018) (plaintiff need not demonstrate a loss of sales in fact "so long as a reasonable basis exists for the belief that an advertising claim will

cause the plaintiff injury"); *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989) ("Of course, because of the possibility that a competitor may suffer future injury ... a competitor need not prove [past] injury when suing to enjoin conduct that violates section 43(a).").

Accordingly, the Court turns to Upper Deck's agreement with Jump 23 to determine the scope of Upper Deck's rights to Jordan's registered trademarks before turning to whether Pixels' use of Jordan's marks has resulted in or likely results in damage to Upper Deck's ability to profit from its rights afforded by the agreement. (*See* ECF Nos. 76-1, 117-1 ("Jump 23 Agreement").)  Contract interpretation is a question of law to be determined by the Court.  *See FiTeq Inc v. Venture Corp.*, 169 F. Supp. 3d 948, 955 (N.D. Cal. 2016) (citing *TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, 40 Cal.4th 19, 27, 50 (2006)).

According to the Jump 23 Agreement, Upper Deck has "exclusive license" to "develop, manufacture, produce, advertise, promote, distribute, and sell" and "signed and unsigned memorabilia" containing Jordan's "Attributes" (including "name, image, likeness. . . picture . . . signature") (Jump 23 Agreement, §§ 1(A), 2(A)(ii)).  Although the Jump 23 Agreement states that Upper Deck agrees that Jump 23 and Jordan retain rights to license Jordan's Attributes to others (Jump 23 Agreement, § 3), the record does not indicate that Jump or Jordan have done so.[7]  The Jump 23 Agreement further indicates that Upper Deck has priority use of Jordan's Attributes in memorabilia over third parties, including in agreeing that Jump 23 "will not grant any rights to any third party in direct competition with [Upper Deck]."  (*See* Jump 23 Agreement, § 8(C)).

Thus, under the Jump 23 Agreement, Upper Deck has exclusive merchandising rights to Jordan's "Attributes", which demonstrate Upper Deck's commercial interest.  *See Hill Collections, Inc. v. Safeway, Inc.*, No. CV199570MWFJEMX, 2019 WL 8889998, at

---

[7] The Court notes the Jump 23 Agreement explicitly excludes certain tradenames owned by Nike, Inc. (*e.g.*, tradename "Air Jordan," the "Jumpman" logo) from the definition of "Attributes."  (*See* Jump 23 Agreement, § 1(A).)

- 24 -

24cv923

*4 (C.D. Cal. Dec. 17, 2019) (ownership of merchandising rights and royalty interests constitutes commercial interest). Moreover, Upper Deck has a right to sublicense its license to third parties (Jump 23 Agreement, § 23).

Next, the Court interprets the Jump 23 Agreement to discern whether Upper Deck's merchandising rights to Jordan's "Attributes" includes Upper Deck's right to use Jordan's trademarks at dispute in this action.

First, the fact that "name" is listed as Jordan's "Attributes" (Jump 23 Agreement, § 1(A)) indicates that the Jump 23 Agreement intended to delegate merchandising rights to Upper Deck for use of the Jordan's trademark in his name, registered at USPTO No. 1487719 ("Jordan Name Trademark"). Even though Jordan's name and the Jordan Name Trademark could be distinct as a legal fiction, it is pragmatically impossible to delegate the use of Jordan's name for merchandising without also delegating the use of the Jordan Name Trademark. *Cf Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 991 (9th Cir. 2006) ("[I]t is hard to imagine that GMP could exploit Glenn Miller's publicity rights without using a trademark containing the Glenn Miller name. Therefore, the Court finds that [the] 1956 agreement is susceptible to only one reasonable interpretation—that it conveys both a trademark license and a license of Glenn Miller's publicity rights."). Further, there is no indication in the plain text of the Jump 23 Agreement that Jump 23 and Upper Deck intended for the contract to delegate merchandising rights to Jordan's "name" without delegating those rights to the Jordan Name Trademark.

Second, though the Jump 23 Agreement does not reference Jordan's registered trademark in the number 23, registered at USPTO No. 2547960 ("Trademark 23"), it is plausible that Upper Deck's merchandising rights to Jordan's "likeness" or "image" as described in Jump 23 Agreement includes merchandising rights to Trademark 23. Indeed, in the sample products at issue in this lawsuit (*see* ECF No. 24 ¶ 33), the number 23 is depicted on Jordan's basketball jersey. (*See e.g.*, ECF Nos. 117-3–117-10.) Collectively, the Court refers to the Jordan Name Trademark and Trademark 23 as "Jordan's Marks".

24cv923

Though Pixels claims it does not sell the *exact* same products as Upper Deck (ECF No. 117-17 ("products [sold on Pixels' websites] do not include trading cards, milk caps, and sticker albums"), Pixels' sale of sports memorabilia containing the same commercially relevant elements (*i.e.*, Jordan's Marks) threatens Upper Deck's commercial interests to Jordan's Marks granted by the Jump 23 Agreement. *Cf Obesity Rsch. Inst., LLC*, 310 F. Supp. 3d at 1115 (finding plaintiff's false advertising claim falls within the Lanham Act's zone of interests in part, because "Shimizu also distributes glucomannan, which is the main ingredient in Lipozene"). For the Jump 23 Agreement grants Upper Deck a license to sell all "signed and unsigned memorabilia" with Jordan's Marks—not just the memorabilia specifically listed as examples in the contract (*e.g.*, trading cards, milk caps, and sticker albums). (Jump 23 Agreement, § 2(A)).

In sum, because Upper Deck has demonstrated that it has relatively exclusive authorization to produce and sell sports memorabilia with Jordan's Marks, and that Pixels sells similar sports memorabilia as Upper Deck with Jordan's Marks on its website (ECF No. 90 at 12:22-27), a reasonable jury could find that Pixels' use of Jordan's likeness in its own similar products could result in a loss of sales of Upper Deck's products and threatens Upper Deck's commercial interests as defined by *Lexmark Int'l, Inc.*, 572 U.S. at 137.

### 2.     Proximate Cause for False Advertising

To establish the proximate cause prong for false advertising, a plaintiff must also allege that it experienced "economic or reputation injury" proximately caused by the defendant, which occurs when "the deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc.*, 572 U.S. at 133. Importantly, a plaintiff must demonstrate a causal link between lost sales or reputational damage and defendant's false advertising to establish proximate cause. *Bobbleheads.com, LLC v. Wright Bros., Inc.*, 259 F. Supp. 3d 1087, 1097 (S.D. Cal. 2017).

Courts within the Ninth Circuit have found there to be proximate cause where the defendants falsely advertised an unofficial product aiming to divert sales from plaintiff's official product; and where the unofficial product had lower production costs. *See e.g.,*

24cv923

*Sweegen, Inc. v. Manus Bio Inc.*, No. 8:24-CV-01757-JVS-DFM, 2024 WL 5317280, at *5 (C.D. Cal. Dec. 19, 2024) (finding proximate cause where "false statements allow Manus to 'pass off cheaper costing fermentation Reb M made from sugar sources as bioconversion Reb M made from Stevia plants while in direct competition with Sweegen who has to shoulder the real [ ] cost of actually producing actual bioconversion Reb M from Stevia plants.' "); *see also Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089, 1115 (S.D. Cal. 2018) ("FRI has provided enough evidence to support its allegations that ORI proximately caused Shimizu's injuries by using a clinical study analyzing Propol to sell an allegedly inferior glucomannan product . . . [which] contains a cheap 'knockoff' product.").

Here, the Court finds there to be a triable issue as to proximate cause because the use of Jordan's Marks without permission from Upper Deck or Jordan—meaning the products offered for sale on Pixels' website containing those marks (*see e.g.*, ECF Nos. 117-3–117-10) are unofficial and thus, "inferior." Moreover, Pixels' products have a lower cost of production than "official" products that Upper Deck sells or authorizes the sale of via sublicenses. Pixels does not pay royalties to anyone. Meanwhile, Upper Deck pays royalties to Jump 23 (ECF No. 90 at 15:23–16:9); and Upper Deck's sublicensees pay Upper Deck royalties (ECF No. 90 at 20:26–21:3.) Thus, the facts of the current case are analogous to *Sweegen, Inc.*, 2024 WL 5317280, at *5 and *Obesity Rsch. Inst., LLC*, 310 F. Supp. 3d at 1115, where courts have found proximate cause for plaintiffs' false advertising claims for similar reasons.

Further, the fact that both Upper Deck and Pixels sell products within the niche sports memorabilia market militates towards finding Upper Deck's commercial injuries are proximately caused by Pixels' false advertising. *Forged Threadworks, Inc. v. Infidel Indus. LLC*, No. CV147200MWFAJWX, 2015 WL 11438100, at *1 (C.D. Cal. June 2, 2015) ("Defendant targets the same customers as Plaintiff does, putting the two entities in direct competition"); *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 826 (9th Cir. 2011)

24cv923

("We have generally presumed commercial injury when defendant and plaintiff are direct competitors and defendant's misrepresentation has a tendency to mislead consumers").

For the reasons above, Upper Deck has presented sufficient evidence to challenge Pixels' motion for summary judgment on its false advertising claim for lack of standing.

### b. Elements

Pixels also moves for summary judgment of Upper Deck's false advertising claims on grounds that Upper Deck cannot satisfy the elements of its false advertising claim. (ECF No. 74 at 2:16-21.)

To succeed on a false advertisement claim under § 1125(a)(1)(B), a plaintiff must prove:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by lessening of the goodwill associated with its products.

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014), *as amended* (Mar. 11, 2014) (citing *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997)). The false advertisement test requires a plaintiff to show all five elements. *Id.*

Regarding the first prong, a plaintiff may "demonstrate falsity within the meaning of the Lanham Act" by showing that the at-issue statement is: (1) literally false on its face; (2) literally false by necessary implication; or (3) "literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139. "When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." *Id.* at 1140. "When a statement is literally false, the second and third elements of actual deception and material are presumed." *San Diego Cnty. Credit Union v. Citizens Equity*

24cv923

*First Credit Union*, 360 F. Supp. 3d 1039, 1052 (S.D. Cal. 2019). "[U]nder the false-by-necessary-implication doctrine, '[i]f the words or images, considered in context, necessarily imply a false message, the advertisement is literally false[,] and no extrinsic evidence of consumer confusion is required.' " *Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC*, 519 F. Supp. 3d 839, 846 (D. Or. 2021) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2nd Cir. 2007)). "[I]f the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Id.* (quoting *Time Warner Cable*, 497 F.3d at 158).

Merely using a competitor's trademark is not a "statement" for purposes of false advertising under the Lanham Act. *Apple Inc. v. Amazon.com Inc.*, 915 F. Supp. 2d 1084, 1090 (N.D. Cal. 2013). More specifically, "'mere use of' an allegedly infringing trademark 'cannot be construed as a representation that the nature, characteristics, or quality of [defendant's product] is the same as that of [plaintiff's product]." *Gearsource Holdings, LLC v. Google LLC,* No. 18-CV-03812-HSG, 2020 WL 3833258, at *12 (N.D. Cal. July 8, 2020) (mere display of plaintiff's G SUITE mark on defendant's webpages, without more, does not constitute a false statement).

However, "disseminat[ing]" a competitor's trademark to the "relevant purchasing public," such that it is understood by relevant consumers to carry a "significant commercial weight," constitutes a false statement. *See Agri Star Meat & Poultry, LLC v. Doheny Kosher Meat, Inc.*, No. CV133384MWFPLAX, 2013 WL 12113410, at *5 (C.D. Cal. Sept. 30, 2013) ("The glatt kosher label implies a particular method of production and processing that is of critical religious significance to those who adhere to a strict glatt kosher diet . . . Literally false use of a glatt kosher label in a commercial advertisement or promotion could support a claim of false advertising.").

Here, Upper Deck has identified a "false statement of fact" by Pixels in a "commercial advertisement about its own or another's product," *Wells Fargo & Co.*, 758 F.3d at 1072 (citing *Southland Sod Farms*, 108 F.3d at 1139) via Pixels' advertising of products containing Jordan's trademarks on its website. Upper Deck has provided

- 29 -

evidence that it is the only company that can use Jordan's Marks to produce sports memorabilia.  Upper Deck has also presented evidence that its brand is well-respected within the sports collectible consumer base.

Upper Deck's expert, Gabriel Garcia Villalobos testifies (*See* ECF No. 90-3 at 14:18-24):

> [T]he savvy collector has an understanding of Upper Deck products and the athletes that Upper Deck represents, specifically Michael Jordan. There's an association with seeing Michael Jordan's name, image, likeness on any collectible product, that it is exclusively a right and a product of Upper Deck.

In that sense, Pixels' use of Jordan's Marks is analogous to the defendant's use of the "glatt kosher" label in *Agri Star Meat & Poultry, LLC*, 2013 WL 12113410, at *5 to describe the production of a specialized product to a niche community (*i.e.*, sports memorabilia collectors).  Moreover, the fact that some of the images are accompanied by the names of the persons uploading the images on Pixels website (*see* ECF No. 117 at 22:7-21) does not undermine the misleading nature of Pixels' use of Jordan's trademarks in advertising its products.  *Cf Southland Sod Farms*, 108 F.3d at 1140 ("Even if an advertisement is not literally false, relief is available under Lanham Act § 43(a) if it can be shown that the advertisement has misled, confused, or deceived the consuming public.").

\* \* \*

Finding triable issues remain, the Court **DENIES** Pixels' request for partial summary judgment of Upper Deck's false advertising claim.  (ECF No. 74 at 2:16-21.)

### ii.      False Association

### a.      Standing

In *Lexmark*, the Supreme Court explicitly distinguished false association claims under 15 U.S.C. § 1125(a)(1)(A) ("§ 1125(a)(1)(A)") from false advertising claims under § 1125(a)(1)(B).  *See Lexmark Int'l, Inc.*, 572 U.S. 118, 122 (2014) (citing *Waits v. Frito–Lay, Inc.,* 978 F.2d 1093, 1108 (9th Cir. 1992)) ("Section 1125(a) thus creates two distinct bases of liability: false association, § 1125(a)(1)(A), and false advertising, §

- 30 -

1125(a)(1)(B)").  "The Ninth Circuit recognizes a cause of action for false endorsement as one type of false association claim."  *See also Miller v. Easy Day Studios Pty Ltd*, No. 20CV02187-LAB-DEB, 2022 WL 20289094, at *4 (S.D. Cal. Sept. 16, 2022) (citing *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992)).

Lower courts have applied the same two-pronged approach to statutory standing for false association claims as for false advertising claims requiring plaintiff to demonstrate: (1) a commercial interest falling with the "zone of interests" the Lanham Act intended to protect by affording the false association cause of action, and (2) its injuries were proximately caused by defendant's false association.  *See e.g., Yelp, Inc. v. ReviewVio, Inc.*, No. C 23-06508 WHA, 2024 WL 2883668, at *2 (N.D. Cal. June 6, 2024) ("The Supreme Court's analysis, while directly addressing a false advertising claim under § 1125(a), is broad enough to cover standing for false association claims under § 1125(a)"); *6th St. Partners, LLC v. Bd.*, No. CV2106595RSWLJPRX, 2021 WL 8445826, at *3 (C.D. Cal. Dec. 3, 2021) ("[T]o establish standing under the false association prong of the Lanham Act, a plaintiff need only allege: 1) a commercial interest in a trademark; and 2) commercial injury based upon the deceptive use of the mark.").

### 1.  Commercial Interest for § 1125(a)(1)(A) Claims

Though applying the same two-part test in *Lexmark*, lower courts have differed on whether false association claims protect the same "zone of interests" as false advertising claims.  *See Yelp, Inc.*, 2024 WL 2883668, at *2 (all 1125(a) claims aim to protect against economic or reputational injury, *i.e.*, unfair competition); *see also 6th St. Partners, LLC*, 2021 WL 8445826, at *3 (false association claims aim to prevent consumer confusion, rather than unfair competition).

This Court adopts the approach that false association claims aim to prevent consumer confusion rather than unfair competition—especially since *Lexmark* explicitly contemplated that false association and false advertising claims tended to protect different Lanham Act interests.  *Lexmark Int'l, Inc.*, 572 U.S. 118, 131 (2014) ("Most of the enumerated purposes are relevant to false-association cases; a typical false-advertising case

- 31 -

24cv923

will implicate only the Act's goal of 'protect[ing] persons engaged in [commerce within the control of Congress] against unfair competition.' ").

Under this approach, to establish that a false association claim falls within the "zone of interests" under *Lexmark*, Upper Deck only need allege it has a commercial interest in the relevant trademarks that were allegedly misused—rather than additionally prove presence of commercial competition between Upper Deck and Pixels as necessary for false advertising claims. *See 6th St. Partners, LLC*, 2021 WL 8445826, at *3. As for false advertising claims, Upper Deck does not need to establish ownership to allege a commercial interest regarding false association claims and can, instead, demonstrate a commercial interest based on use of the relevant marks to sell goods and/or an exclusive license to use the relevant marks. *See e.g.*, *id.*, at *3 (plaintiff demonstrates a commercial interest in a trademark for purposes of false association standing when it has invested substantial funds into using the mark to promote a service provided exclusively at its own restaurant and to attract customers to its business); *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1066 (9th Cir. 2015) (non-owner plaintiffs had standing to sue for false endorsement/affiliation claims based on an exclusive license to "design, manufacture, and sell t-shirts and other merchandise bearing Marley's image"); *Hem & Thread, Inc. v. Wholesalefashionsquare.com*, No. 2:19-CV-283-CBM-AFM, 2019 WL 3017669, at *2 (C.D. Cal. Mar. 27, 2019) (citing *Halicki Films, LLC v. Sanderson Sales & Mktg.*, 547 F.3d 1213, 1225 (9th Cir. 2008)) (non-owner plaintiff demonstrated a "cognizable commercial interest in the [] mark" sufficient for standing where plaintiff had sold garments using the relevant trademark).

Because Upper Deck has claimed that it has exclusive rights to produce sports memorabilia with Jordan's likeness (including the Jordan Name Trademark and Trademark 23), *supra* § III.A.3.i.a.1, pays royalties to Jump 23 for use of Jordan's Marks (*see* ECF No. 90 at 15:23–16:9), and garnered goodwill from a longstanding loyal fanbase for its sports memorabilia made with Jordan's Marks (*see e.g., id.* at 16:5-6 ("The consistent, multi-year record of sales [of Jordan-related trading cards] demonstrates a high volume of

- 32 -

commerce for goods featuring the Hologram")), a reasonable jury could conclude that Upper Deck has a commercial interest in Jordan's Marks.

### 2. Proximate Cause for False Association

To establish proximate cause for false association claims, it is sufficient to demonstrate misuse of the relevant mark is likely to cause consumer confusion. *See 6th St. Partners, LLC*, 2021 WL 8445826, at *4 (for false affiliation claims, "the allegation of consumer confusion is alone sufficient to establish a commercial injury under the Lanham Act."); *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992) (for false endorsement/affiliation claims, "celebrity's interest in the marketing value of his identity is similar to that of a trademark holder, and its misuse through evocation of celebrity's persona that creates likelihood of consumer confusion as to celebrity's endorsement is actionable under Lanham Act") (citing *Allen v. Nat'l Video, Inc.*, 610 F. Supp. 612, 625, 628 (S.D.N.Y. 1985)).

For the reasons discussed in this Order's sections analyzing likelihood of consumer confusion, *supra* §§ III.A.2 and III.A.3.ii.b, the Court finds Upper Deck has presented sufficient evidence for a reasonable jury to find for misuse of the relevant mark. As such, triable issues remain as to Upper Deck's standing to pursue its false association claim.

### b. Likelihood of Consumer Confusion

Under the Lanham Act's false endorsement provision,

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

§ 1125(a)(1)(A).

- 33 -

24cv923

Likelihood of consumer confusion is the determinative issue for false endorsement claims. *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149 (9th Cir. 2002). The *Sleekcraft* factors regarding proximity of goods, similarity of marks, actual confusion, marketing channels used, and likelihood of expansion of product line follow the same analysis as above for the Upper Deck Hologram Mark, *supra* § III.A.2, given that both Parties use the same mark (here, Jordan's Marks) to sell sports memorabilia online.

Insofar as Upper Deck's cause of action for false affiliation is based on Pixels' use of Jordan's Marks, rather than the Upper Deck Hologram Mark, the Court separately analyzes the remaining *Sleekcraft* factors—strength of mark, degree of care exercised by purchasers, and intent in selecting mark.

The strength of Jordan's Marks is determined by their conceptual strength and commercial strength. Parties do not debate that the Jordan Marks (Trademark 23 and Jordan Name Trademark) are conceptually or commercially strong. Like the Upper Deck Hologram Mark, Jordan's Marks have been used in connection with the sale of goods by Jordan and by Upper Deck as a licensee for decades nationally and internationally. (ECF No. 90 at 15:2-4, 22:15-24.) As such, Jordan's Marks are also commercially strong.

Next, regarding the degree of care exercised by purchasers, the analysis *supra* § III.A.2.vii applies for products containing both the Upper Deck Hologram Mark and Jordan's Marks (*e.g.*, the framed print of the 1986-87 Fleer Michael Jordan Rookie Card trading card). However, the Court further analyzes this *Sleekcraft* factor for products that do not display the Upper Deck Hologram Mark, but that do display Jordan's Marks. (*See e.g.*, ECF No. 24 ¶ 33.) As with the Upper Deck Hologram Mark, Parties do not dispute that Jordan's Marks are used exclusively by Jordan and Jordan's licensees in connection with the sale of goods. Upper Deck asserts that it is among the few authorized manufacturers of sports memorabilia containing Jordan's likeness—which Upper Deck's consumers may be aware of given their relative sophistication, *supra* § III.C.3.viii. (*See* ECF Nos. 90 at 22:15-24, 90-3 at 14:18-24.)

24cv923

The current case is similar to *Cairns*, in which the Ninth Circuit reasoned that purchasers are unlikely to be confused as to the origin of the defendant's unendorsed products containing Princess Diana's likeness because only twenty products had been endorsed by Princess Diana's estate among a flood of un-endorsed Diana-related products. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1149–50 (9th Cir. 2002).

By holding that defendant's unendorsed products were unlikely to cause consumer confusion, the *Cairns* Court implied that the purchasers of the few endorsed Diana-related products are sophisticated enough to identify them and would be likely to exercise case in purchasing them. Similarly, here, counterfeit products containing Jordan's Marks and likeness flood the market. (*See* ECF No. 90-3 at 5:8-22.) Additionally, the relevant purchasers are likely to be sophisticated, discerning purchasers who recognize Upper Deck's relatively exclusive rights to Jordan's Marks on sports memorabilia. (*See* ECF No. 90-3 at 14:18-24.)

Moreover, the record contains evidence that products displaying Jordan's Marks can be costly. (*See e.g.*, ECF Nos. 117-21 at 4 (Jordan's jersey while playing with the Chicago Bulls cost up to $10 million), 90 at 17:24-25 (providing public weblink showing a copy of the 1986-87 Fleer Michael Jordan Rookie Card was sold at an auction for $840,000). Since the relevant consumers are likely sophisticated and products containing Jordan's Marks can be costly, the *Sleekcraft* factor regarding degree of care exercised by the purchaser factors against likelihood of confusion.

Lastly, the Court finds Upper Deck has presented evidence Pixels intended to use Jordan's Marks. For instance, in 2022, Upper Deck had sent Pixels cease-and-desist letters regarding Pixels' use of Jordan's Marks in products offered for sale on Pixels' websites. (ECF No. 79-9.) Pixels promptly responded to Upper Deck's letter (ECF No. 79-10), but continued to use Jordan's Marks after their email exchange (ECF No. 79-11). *See e.g., Gizmo Beverages, Inc. v. Park*, No. SACV171037DOCJDE, 2017 WL 6940560, at *5 (C.D. Cal. Sept. 18, 2017) (finding intent under the present *Sleekcraft* factor where "Defendant continued to use the marks even after Plaintiff's three cease and desist letters

- 35 -

informing it of its infringement and Defendants' willfully infringing on Plaintiff's marks."). As such, the *Sleekcraft* factor regarding intent to use the mark factors towards finding likely consumer confusion.

Despite finding the *Sleekcraft* factor regarding degree of care exercised by purchaser goes against likelihood of confusion, the Court finds that there are triable issues regarding its use of the Upper Deck Hologram Mark with respect to six *Sleekcraft* factors. The remaining *Sleekcraft* factor (likelihood of expansion of product lines) is neutral in the present case.

* * *

For the reasons above, the Court finds triable issues remain as to Upper Deck's false endorsement cause of action and **DENIES** Pixels' request for summary judgment. (ECF No. 74.)

## B.    California Right of Publicity and Unfair Competition

Upper Deck asserts the following California state law causes of action: (1) deprivation of rights of publicity (Cal. Civ. Code § 3344) (Count 4); (2) violation of rights of publicity under California common law (Count 5); (6) violation of California unfair competition law (Cal. Bus. & Prof. Code § 17200 *et seq.*) (Count 6); (7) violation of California common law unfair competition (Count 7). (ECF No. 24 ¶¶ 41–95.) Pixels moves for summary judgment on Upper Deck's California state law causes of action. (ECF No. 74 at 2:22–3:7.)

### 1.    Rights of Publicity

A licensee of an individual's right to publicity has standing to sue for both the statutory and common law rights of publicity. *Upper Deck Co. v. Flores*, 569 F. Supp. 3d 1050, 1068–69 (S.D. Cal. 2021). Here, Upper Deck brings statutory and common law California state law causes of action for Pixels' misappropriation of Upper Deck's publicity rights to Jordan's likeness afforded by the Jump 23 Agreement. (*See* ECF No. 24 ¶¶ 62–70 (right of publicity action under Cal. Civ. Code § 3344, Count IV); *see also id.* ¶¶ 71–76 (right of publicity action under California common law).) Pixels moves for summary

- 36 -

24cv923

judgment on grounds that Upper Deck does not have standing to pursue its rights of publicity claims, since Upper Deck did not have an agreement with Jordan personally assigning Upper Deck explicit rights to publicity. (ECF Nos. 74 at 2:26-28, 117 at 25:9–27:2.) Additionally, Pixels presents expert testimony casting doubt as to Jump 23, Inc.'s rights to Jordan's publicity and the subsequent legitimacy of the Jump 23 Agreement wherein Jump 23, Inc. licensed Jordan's publicity rights to Upper Deck. (*See* ECF Nos. 117 at 9:4-11, 117-14 at 3:18-24 and 8:5-8.)

However, the record is replete with evidence that at the very least, triable issues remain as to both Jump 23's and Upper Deck's publicity rights to Jordan's likeness. First, the definition of Jordan's Attributes in the Jump 23 Agreement, § 1(A), originated in 1991 from an agreement between Jordan and Jump 23. (*See id*. at 9:21-24.) Upper Deck and Jump 23 have been operating under that same definition of Jordan's Attributes for decades, as Upper Deck has carried out national and international sales of products containing Jordan's likeness pursuant to its licensing rights under the Jump 23 Agreement. (*See id*. at 9:5-7; *see also* ECF No. 90 at 15:2-4, 15:23–16:9.) Next, in the preamble of the Jump 23 Agreement, Jump 23 represented it had been assigned the exclusive right to contract for the use of the name and likeness of Michael Jordan. (*See* ECF No.117-1 at 2.) Furthermore, as discussed at length *supra* § III.A.3.i.a.1, Jump 23 granted Upper Deck merchandising rights to use Jordan's likeness (including Jordan's Marks) in its memorabilia via the Jump 23 Agreement. Additionally, in an addendum to the Jump 23 Agreement, Jump 23 explicitly granted Upper Deck rights to pursue legal claims against Pixels for Pixels' misuse of Jordan's name and likeness. (*See* ECF No. 117-1 at 22.)

Accordingly, finding triable issues remain, the Court **DENIES** Pixels' motion for summary judgment on Upper Deck's right of publicity causes of action. (ECF No. 74 at 2:26-28.)

### 2.    Unfair Competition Law

Upper Deck brings statutory and common law California state law causes of action for alleged violation of California unfair competition law. (*See* ECF No. 24 ¶¶ 77–90

- 37 -

24cv923

(unfair competition law action under Cal. Bus. & Prof. Code § 17200 *et seq.*, ("UCL") Count 6); *see also id.* ¶¶ 91–95 (unfair competition action under California common law, Count 7).)  Regarding Upper Deck's UCL cause of action (Count 6), Pixels asserts that Upper Deck does not present evidence of an economic injury, predicate violation, or statutory remedy necessary to establish UCL standing.  (ECF No. 117 at 27:3–29:3.) Regarding Upper Deck's common law unfair competition claims, Pixels claims Upper Deck does not provide sufficient evidence of "palming off".  (*Id.* at 29:4–30:5.)

### i.    Cal. Bus. & Prof. Code § 17200 ("UCL")

#### a.    Standing

A plaintiff alleging a UCL claim must satisfy UCL statutory standing requirements. *See Birdsong v. Apple, Inc.,* 590 F.3d 955, 960 n. 4 (9th Cir. 2009).  A UCL plaintiff with standing is a person who has: (1) suffered injury in fact and (2) lost money or property as a result of the unfair competition.  *Degelmann v. Advanced Medical Optics, Inc.,* 659 F.3d 835, 839 (9th Cir. 2011) (citing Cal. Bus. & Prof. Code § 17204).

In *Kwikset,* the California Supreme Court explained that "[t]he plain import [of the lost money or property requirement] is that a plaintiff now must demonstrate some form of economic injury." *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 323 (2011).  "There are innumerable ways in which economic injury from unfair competition may be shown [including having] a present or future property interest diminished."  *Id.*; *see also Clayworth v. Pfizer, Inc.,* 49 Cal.4th 758, 788 (2010) (the *threat* of *impending* foreclosure as a result of alleged unfair business practices was sufficient economic injury to confer standing under UCL).

Additionally, to establish UCL standing, a plaintiff must establish a " 'causal connection' between [defendant's] alleged UCL violation and [the] injury in fact." *Panno v. Wells Fargo Bank, N.A.*, No. SACV160118DOCKESX, 2016 WL 7495834, at *10 (C.D. Cal. Apr. 1, 2016) (citing *Rubio v. Capital One Bank,* 613 F.3d 1195, 1203–04 (9th Cir. 2010)); *see also Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1349 (2009) ("[T]he

- 38 -

24cv923

phrase 'as a result of' connotes an element of *causation* (*i.e.*, [plaintiff] lost money because of [defendant's] unfair competition.").

Here, Pixels moves for summary judgment of Upper Deck's statutory UCL cause of action, in part, on grounds that Upper Deck does not have UCL standing.  (ECF No. 74 at 3:1-2.)  Pixels points out Upper Deck did not provide any actual evidence it lost money or property as a result of Pixels' unfair competition: "[Upper Deck] did not part with its own money, it had no claim to the money paid for the products in question, and no sales of such products had any impact on [Upper Deck] or its financial affairs." (ECF No. 117 at 27:23-25.)

Upper Deck counters that, through misappropriating Jordan's likeness and intellectual property for which Upper Deck has a license to use and to sublicense, Pixels causes Upper Deck economic injury in the form of lost profits and royalties from sublicensees.  (ECF Nos. 90 at 21:2-3; 90-3 at 6:15-21.)  Even if Upper Deck did not provide evidence that it has incurred monetary loss in fact, the Court finds Upper Deck has sufficiently demonstrated likely monetary loss to establish injury-in-fact under UCL and Article III standing. *Clayworth*, 49 Cal.4th at 788; *Ass'n of Data Processing Servs. Orgs., Inc.*, 397 U.S. at 152–53.

Further, Upper Deck introduces sufficient evidence of causal connection between Pixels' actions violating the UCL and Upper Deck's loss.  Pixels had used Jordan's likeness (including Jordan's Marks) without making royalty payments to either Upper Deck or Jump 23. *Cf Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 2342365, at *7 (N.D. Cal. May 3, 2016) ("As to the causal connection, a reasonable jury could find a direct causal connection between Google's alleged [copyright] infringement and Oracle's loss of licensing revenues from Java ME.").  Also, Pixels' knock-off sports memorabilia containing Jordan's likeness and Marks directly compete against Upper Deck's products, for which Upper Deck shoulders the cost of licensing. *Adelos, Inc. v. Halliburton Co.*, No. CV-16-119-DLC, 2017 WL 3836136, at *2 n.4 (D. Mont. July 7, 2017) ("[I]f HESI cut

24cv923

into Adelos's market share by its unauthorized use of Adelos's intellectual property, pecuniary damages are plausible.").

Accordingly, construing the evidence in favor of Upper Deck, the Court finds that Upper Deck has demonstrated triable issues remain as to Upper Deck's UCL standing.

### b.    Predicate Violation

UCL's prohibition of an "unlawful, business act or practice," requires a predicate federal or state law claim. *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 974 (9th Cir. 2024). "[A]ctions pursuant to [the UCL] are 'substantially congruent' to claims made under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994). Thus, "violations of the Lanham Act ... can serve as a predicate basis for a claim of unlawful and unfair practices under the UCL." *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, No. 20-CV-06957, 2021 WL 1253803, at *7 (N.D. Cal. Apr. 5, 2021). Additionally, courts have interpreted conduct violative of the California right of publicity to form the basis as an unfair or unlawful business practice prohibited by the UCL. *Kellman v. Spokeo, Inc.*, 599 F. Supp. 3d 877, 896 (N.D. Cal. 2022) (finding UCL violation where "California's right of publicity is intended to protect the interests that Spokeo is alleged to have threatened").

Pixels moves for summary judgment of Upper Deck's UCL cause of action because Upper Deck allegedly failed to demonstrate "evidence of a predicate act or practice sufficient to support the UCL claim." (ECF No. 117 at 28:4-8 (citing *Capito v. San Jose Healthcare System, LP*, 17 Cal. 5th 273, 283–84 (2024).). However, given that the Court has denied Pixels' motion for summary judgment on Upper Deck's claims that can serve as predicate violations for its UCL cause of action (*e.g.*, Lanham Act violations, California rights of publicity violations), the Court similarly finds triable issues remain as to Upper Deck's UCL cause of action.

### c.    Available Remedy

Pixels also moves for summary judgment of Upper Deck's UCL cause of action on the basis that Upper Deck has not demonstrated an adequate remedy at law. (ECF No. 117

at 28:9–29:3.)   For Pixels' alleged UCL violation, Upper Deck seeks restitution (*i.e.*, money or property obtained as a result of illegal practices) and injunctive relief (*i.e.*, to prohibit Pixels from continuing to misappropriate Jordan's likeness and Marks for which Upper Deck has exclusive license to use).  (ECF No. 24 ¶¶ 84–85.)

"[B]ecause a UCL action is equitable in nature, its remedies for private individuals "are limited to restitution and injunctive relief." *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 661 (N.D. Cal. 2020).  Restitution is the sole form of monetary relief available under the UCL.  *Feitelberg v. Credit Suisse First Boston, LLC,* 134 Cal.App.4th 997, 1016 (2005).  Restitution is an equitable remedy, which requires demonstrating a lack of alternative adequate remedy at law and a past harm.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d. 834, 884 (9th Cir. 2020); *Brooks v. Thomson Reuters Corp.*, No. 21-CV-01418-EMC, 2021 WL 3621837, at *10 (N.D. Cal. Aug. 16, 2021) (citing *Sonner*, 971 F.3d. at 884 (*Sonner* applies only to "equitable *restitution* for *past* harm under the UCL," not to an *injunction* for *future* harm)).

Given that the Court has found triable issues remain as to Upper Deck's Lanham Act and California state publicity right causes of action, Upper Deck may have an adequate remedy at law (*i.e.*, recovering damages for Pixels' Lanham Act or California state publicity right violations).  Thus, there is a genuine dispute of fact as to whether Upper Deck can seek restitution for Pixels' alleged UCL violations.

Injunctive relief under the UCL is also an equitable remedy, and requires demonstrating a lack of alternative adequate remedy at law and an ongoing or future harm. *Brooks v. Thomson Reuters Corp.*, No. 21-CV-01418-EMC, 2021 WL 3621837, at *11 (N.D. Cal. Aug. 16, 2021) ("Without an injunction . . . there is no way the Court can ensure that Thomson Reuters will stop selling Plaintiffs' personal information without their consent . . . [d]amages for past sales are not likely to dissuade Thomson Reuters from continuing this behavior in the future.").

To meet its initial burden as movant for summary judgment, Pixels claims that "all identified URLs have been disabled" (ECF No. 117 at 29:1-3), and so there is no ongoing

24cv923

harm for which Upper Deck can seek injunctive relief.  However, Pixels also represents that its websites contain "over 25,000,000 images uploaded by over 650,000 Contributors" and that Pixels does not solicit, preview, or know they are there.  (ECF Nos. 89 at 12:17-21, 117-17 ¶¶ 2, 7–9, 12.)  In other words, Pixels has not presented evidence that it either has or will adopt new measures to exclude illicit images from arising on its site.  Thus, construing the evidence in favor of Upper Deck, the Court finds triable issues remain as to whether Upper Deck can seek injunctive relief for its UCL claims.

* * *

For the reasons above, the Court **DENIES** Pixels' motion for summary judgment on Upper Deck's UCL cause of action.  (ECF No. 74.)

### ii.    California Common Law Unfair Competition

To prevail on a common law unfair competition claim, a plaintiff must prove that the defendant tried to pass off false goods as those of the plaintiff.  *Nautilus, Inc. v. Hempel*, No. CV 12-07430 DMG (EX), 2013 WL 12133877, at *4 (C.D. Cal. June 20, 2013) (citing *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992)).  The tort has been extended to situations other than classic "passing off."  *Nautilus, Inc.*, 2013 WL 12133877, at *4 (citing *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 193 (1999)).  "[U]nfair competition applies to all cases where fraud is practiced by one in securing the trade of a rival dealer."  *Id.*

"[T]he Ninth Circuit 'has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code [section] 17200 are substantially congruent to claims made under the Lanham Act.' "  *Spy Optic, Inc. v. Alibaba.Com, Inc.*, 163 F. Supp. 3d 755, 768 (C.D. Cal. 2015) (citing *Cleary v. News Corp.,* 30 F.3d 1255, 1262–63 (9th Cir. 1994)).  Courts within the Ninth Circuit have applied this principle to find that federal statutory trademark infringement, false advertising, and false endorsement/designation of origin claims under the Lanham Act are "substantially congruent" to state common law claims of unfair competition and UCL claims.  *See Spy Optic, Inc.*, 163 F. Supp. 3d at 768; *Lloyds Plumbing, Inc. v. Dutton*

24cv923

*Plumbing, Inc.*, No. CV 18-2353-GW(JCX), 2018 WL 6164327, at \*8 (C.D. Cal. Aug. 20, 2018) (citing *New West Corp. v. NYM Co. of California, Inc.*, 595 F.2d 1194, 1201 (9th Cir. 1979)) ("Whether we call the violation infringement, unfair competition or false designation of origin, the test is identical[:] is there a 'likelihood of confusion?' ").

Here, Pixels moves for summary judgment of Upper Deck's common law unfair competition claims because "there [is] no evidence in the record to show that the defendant passed off its products as plaintiff's products." (ECF No. 117 at 30:1-4.) More specifically, "[e]ven if the images uploaded by the third parties could be attributed to Pixels, nothing in those posting suggests Pixels passed off the images or any related products as those of [Upper Deck] or that [Upper Deck] is the single source for such products." (ECF No. 117 at 30:15-21 (referencing *Los Defensores, Inc. v. Gomez*, 223 Cal.App.4th 377, 393 (2014).) However, even if Upper Deck does not directly allege "palming off," Pixels even admits that demonstrating "analogous acts" to "palming off" can be the basis for common law unfair competition claims. (ECF No. 117 at 28:6-7 (citing *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1187 (S.D. Cal. 2012)).)

Thus, the Court **DENIES** Pixels' motion for summary judgment of Upper Deck's cause of action for common law unfair competition because: (1) trademark infringement and false designation of origin under the Lanham Act are considered plausible bases for common law unfair competition, *Spy Optic, Inc.*, 163 F. Supp. 3d at 768, *Lloyds Plumbing, Inc*, 2018 WL 6164327, at \*8, *New West Corp.*, 595 F.2d at 1201; and (2) the Court has found triable issues remain as to Upper Deck's Lanham Act trademark infringement, false advertising, and false association claims, *supra* §§ III.A.2, III.A.3.

### C. Statute of Limitations or Laches

#### 1. Lanham Act Laches Defense

Because the Lanham Act provides no statute of limitations, the laches doctrine typically governs the timeliness of Lanham Act claims. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836-37 (9th Cir. 2002). Laches is an equitable defense that is distinct from a statute of limitations; though, a laches determination is made with reference

- 43 -

24cv923

to the applicable statute of limitations.  *Id*. at 835.  Thus, when evaluating defendants' laches defenses, courts consider the applicable analogous state law statute of limitations. *Id*. at 838.

If a plaintiff files an action before the statute of limitations has expired, there is a strong presumption that laches is inapplicable.  *See, e.g., Shouse v. Pierce County,* 559 F.2d 1142, 1147 (9th Cir. 1977).  Accrual of the limitations period is subject to the discovery rule: "[T]he limitations period runs from the time the plaintiff knew or should have known about his § 43(a) cause of action." *Jarrow Formulas*, 304 F.3d at 838.  As the Ninth Circuit recognized in *Jarrow Formulas,* "[f]or many Lanham Act claims, the alleged violations are ongoing, *i.e.*, the wrongful acts occurred both within and without the limitations period." *Id.* at 837.  The plaintiff is free to pursue monetary and equitable relief for the time within the limitations period. *Id.*

Federal courts in California have held that laches presumptively applied a three-year statute of limitations to bar plaintiffs' Lanham Act claims.  *See e.g., Grasshopper House, LLC v. Clean & Sober Media, LLC*, No. 218CV00923SVWRAO, 2018 WL 6118440, at *3 (C.D. Cal. July 18, 2018) (citing Cal. Civ. Proc. Code § 338); *Jarrow Formulas*, 304 F.3d at 836.  If applying the three-year statutory limitation, Upper Deck's Lanham Act claim is presumptively untimely under the laches doctrine only if Upper Deck had knowledge or suspicion of each element before March 26, 2021.

However, since *Jarrow Formulas* was handed down in 2002, the Ninth Circuit has held that the analogous state law statute of limitations for Lanham Act violations in California is, instead, four years.  *See Pinkette Clothing, Inc. v. Cosmetic Warriors Limited*, 894 F.3d 1015, 1025 (9th Cir. 2018) ("The most analogous state statute of limitations in this case is California's four-year statute of limitations for trademark infringement actions."); *see also* 4 McCarthy on Trademarks and Unfair Competition § 31:34 (5th ed) (2025) (observing "[p]recedent using a three-year statute [in California] seems to be universally ignored.").

24cv923

Here, Pixels moves for summary judgment to presumptively apply a three-year statute of limitations constrains Upper Deck's Lanham Act claims.[8]  (ECF No. 74 at 3:8-10.)  Pixels has not demonstrated that the Court should presumptively apply a three-year statute of limitations to Upper Deck's Lanham Act claims, *see Jarrow Formulas*, 304 F.3d at 836, rather than a four-year statute of limitations as applied by *Pinkette Clothing, Inc.*, 894 F.3d at 1025.

As such, the Court **DENIES** Pixels' motion for summary judgment that under the Lanham Act, the equitable doctrine of laches applies to bar Upper Deck's claims that fall outside of a three-year period as a matter of law.  (ECF No. 74 at 3:8-10.)

### 2.    California Law Statute of Limitations

The statute of limitations for common law right of publicity in California is two years.  *Cusano v. Klein*, 264 F.3d 936, 950 (9th Cir. 2001) (citing Cal. Code Civ. Proc. § 339).  The statute of limitations for the statutory right of publicity, statutory unfair competition, and common law unfair competition is four years.  *See Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 997 (9th Cir. 2006) (citing Cal. Code Civ. Proc. §§ 337, 343).

Upper Deck does not provide evidence rebutting the applicability of the two-year statute of limitations.  Thus, the Court **GRANTS** Pixels' request for partial summary judgment for the two-year statute of limitations for California law right of publicity claims (*see* ECF No. 74 at 3:11-13, 117 at 30:19-21).  However, the Court **DENIES** Pixels' request for partial summary judgment that Upper Deck's California statutory and common law unfair competition and statutory right of publicity claims on the basis that they are barred by a two-year statute of limitations, since the relevant statute of limitations is four years.

---

[8] In Upper Deck's opposition to Pixels' motion for summary judgment, Upper Deck does not present any evidence to rebut Pixels' laches defense.  (ECF No. 90.)  Instead, Upper Deck claims that this matter should be reserved for a motion in limine.  (ECF No. 90 at 28:19–29:4.)  On this point, the Court finds that, at the summary judgment stage, it may reasonably evaluate the relevance of the evidence presented by the parties.  *See Am. Bankers Ins. Co. of Fla. v. Nat'l Fire Ins. Co. of Hartford*, 488 F. Supp. 3d 892, 896 (N.D. Cal. 2020).  It need not take judicial notice to consider the documents.  *Id.*

- 45 -

24cv923

* * *

In sum, the Court **GRANTS** Pixels' motion for summary judgment that there is a two-year statute of limitations for Upper Deck's California common law right of publicity claims. (ECF No. 74 at 3:11-13.)  However, the Court **DENIES** partial summary judgment that the statute of limitations for Upper Deck's Lanham Act claims is three years (ECF No. 74 at 3:8-10), and that the statute of limitations for California unfair competition and statutory right of publicity claims is two years (*id*. at 3:11-13).

Since Upper Deck filed the original complaint against Pixels in the Superior Court of California on March 26, 2024 before removing the case to this Court (ECF No. 1 at 5) and based on the Court's finding in this Order, Pixels would need to prove that Upper Deck knew about the basis for its claims on or after the dates listed below:

| Cause of Action | Date |
| --- | --- |
| Count 4: Rights of publicity (Cal. Civ. Code § 3344) | March 26, 2020 |
| Count 5: Rights of publicity under California common law | March 26, 2022 |
| Count 6: California unfair competition law (Cal. Bus. & Prof. Code § 17200 *et seq*.) | March 26, 2022 |
| Count 7: California common law unfair competition | March 26, 2022 |

At oral argument, Parties agreed that the specific images that fall within those time frames could be addressed at motions in limine. (ECF No. 184.)

## IV.  UPPER DECK'S MOTION FOR SUMMARY JUDGMENT (ECF No. 79)

### A.  Condition Precedent (Affirmative Defense 7)

A condition precedent is "either an act of a party that must be performed or an uncertain event that must happen before the contractual right accrues or the contractual duty arises." *Platt Pac., Inc. v. Andelson*, 6 Cal.App. 4th 307, 313 (1993).  "Conditions

- 46 -

24cv923

precedent must be expressed in plain, clear, and unambiguous language, but parties need not invoke any 'required magical incantation.' " *Int'l Bhd. of Teamsters v. NASA Services, Inc.*, 957 F. 3d 1038, 1043 (9th Cir. 2020) (quoting *Roth v. Garcia Marquez*, 942 F.2d 617, 626 (9th Cir. 1991)); *see also Realmuto v. Gagnard*, 110 Cal. App 4th 193, 199 (2003) ("The existence of a condition precedent normally depends upon the intent of the parties as determined from the words they have employed in the contract.").

Pixels states that Upper Deck did not comply with a "condition precedent to make Pixels aware of each alleged infringement prior to Upper Deck's filing of the Amended Complaint" (*see* ECF No. 28 ¶ 7, "Affirmative Defense 7."). Upper Deck moved for summary judgment, asserting that there is no condition precedent requirement, given that the undisputed facts demonstrate there was no contract between Upper Deck and Pixels— let alone one requiring Pixels to contact Upper Deck prior to filing suit. (ECF No. 79-1 at 14–15.) Pixels "does not contest Upper Deck's position on the failure of condition precedent defense." (ECF No. 89 at 4:11-12). *Cf Frankel v. Bd. of Dental Examiners*, 46 Cal. App. 4th 534, 550 (1996) ("Conditions precedent are not favored in the law . . . and courts shall not construe a term of the contract so as to establish a condition precedent absent plain and unambiguous contract language to that effect").

In the absence of an express, binding contract requiring Parties to notify each other prior to filing a lawsuit, the Court **GRANTS** Upper Deck's motion for partial summary judgment on Pixels' failure of condition precedent defense (Affirmative Defense 7). (ECF No. 79.)

## B. Pixels as User of Marks (Affirmative Defenses 2 and 15)

Rule 8(c) provides in part that "a party must affirmatively state any avoidance or affirmative defense." Fed. R. Civ. P. 8(c). "[A]n affirmative defense, under the meaning of [Rule] 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven." *Barnes v. AT & T Pension Ben. Plan*, 718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010) (quoted source omitted). "It is a defense on which the defendant has the burden of proof." *Id.* at

1174.  In contrast, "[a] defense which demonstrates that plaintiff has not met its burden of proof is not an affirmative defense." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002).  Defenses of this nature are usually described as "denials" or "negative defenses." *See Gomez v. J. Jacobo Farm Labor Contractor, Inc.*, 188 F. Supp. 3d 986, 995 (E.D. Cal. 2016); *Barnes*, 718 F. Supp. 2d at 1173–74; *see also* 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1270 (3d ed.) (distinguishing affirmative defenses from denials or negative defenses that directly contradict elements of the plaintiff's claim for relief).

In its answer (ECF No. 28), Pixels names affirmative defenses to Upper Deck's Lanham Act causes of action, including:

1. Pixels does not use any marks that appear on websites powered by Pixels (Affirmative Defense 2); and

2. The infringements alleged in the Amended Complaint, if any, and Plaintiff's injuries, if any, were caused by the contributors who uploaded images to Pixels' platform (Affirmative Defense 15)

Upper Deck moves for summary judgment of Pixels' affirmative defenses, including Affirmative Defense 2 and Affirmative Defense 15 (collectively, "Affirmative Defenses 2 and 15").

Courts within this Circuit have found that the core issue Affirmative Defenses 2 and 15 address here—whether Pixels can be liable under the Lanham Act based on its involvement in selling and creating the works involving alleged trademark misuse—is part of Upper Deck's cause of actions for trademark violation for which Upper Deck would bear the burden of proof at trial.  *See e.g.*, *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 (1982) (To succeed on a cause of action for trademark infringement, "[t]he alleged infringer must directly use the trademarks; a party that merely facilitates or assists others' use cannot be liable for direct infringement"); *see also Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264-65 (9th Cir. 1996) ("[A] flea market or swap meet that provides space for trademark infringers to sell their goods is only indirectly liable."); *see also Atari*

- 48 -

*Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1101 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in part*, No. 21-17062, 2023 WL 4704891 (9th Cir. July 24, 2023) (same).

Thus, as a matter of law, the Court finds that Affirmative Defenses 2 and 15 are not affirmative defenses—but rather, alleged defects in Upper Deck's prima facie causes of action (*i.e.*, "negative" defenses). *Barnes*, 718 F. Supp. 2d at 1173.  Moreover, even when viewing the facts most favorably towards Pixels, Pixels has not demonstrated that there is a triable issue as to whether Affirmative Defenses 2 and 15 qualify instead as affirmative defenses.

Accordingly, the Court **GRANTS** Upper Deck's request for summary judgment of Affirmative Defenses 2 and 15.  The Court notes Pixels may raise whether Pixels exercised adequate control over producing and selling the products containing infringing marks at trial as part of disproving Upper Deck's Lanham Act claims.

**C.  Artistic Expression and Transformative Works (Affirmative Defenses 4 and 6)**

Pixels asserts affirmative defenses (ECF No. 28) that:

1. The claims associated with one or more of the images in the Amended Complaint are barred as works of artistic expression under the First Amendment of the United States Constitution (Affirmative Defense 4);

2. The claims associated with one or more of the images in the Amended Complaint are barred as transformative works (Affirmative Defense 6)

(collectively, "Affirmative Defenses 4 and 6").

Upper Deck moves for summary judgment of Affirmative Defenses 4 and 6, specifically alleging that Pixels' use of Jordan's likeness is not protected by the First Amendment or as a transformative work.  (ECF No. 79-1 at 11:23–13:5.)

The First Amendment can provide a complete defense to Lanham Act claims involving artistic works.  *Roxbury Ent. v. Penthouse Media Grp., Inc.*, 669 F. Supp. 2d 1170, 1175 (C.D. Cal. 2009) (citing *E.S.S. Entertainment 2000, Inc. v. Rock Star Videos,*

*Inc.,* 547 F.3d 1095, 1101 (9th Cir.2008)).  Under the test set forth in *E.S.S. Entertainment* ("*Rogers* Test") in the Ninth Circuit, a plaintiff can succeed on Lanham Act claims only if the "public interest in avoiding consumer confusion *outweighs* the public interest in free expression."  *Id.* at 1099 (emphasis in original) (citing *Rogers v. Grimaldi,* 875 F.2d 994, 999 (2nd Cir. 1989)).  The *Rogers* test is the primary route through which courts evaluate defenses to Lanham Act claims at "the intersection of trademark law and the First Amendment."  *E.S.S. Ent. 2000, Inc.*, 547 F.3d at 1099 (9th Cir. 2008).

In 2023, the United States Supreme Court held that the *Rogers* test "does not apply when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods."  *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 153 (2023).  Where the alleged infringer uses a trademark as its own identifying mark, the "infringement claim . . . rises or falls on likelihood of confusion."  *Id.* at 153.  In that case, expressive or transformative[9] uses of the mark may be baked into a likelihood of confusion analysis.  *See e.g., id*. (parodic use of another's trademark can be baked into evaluating whether consumers are likely to be confused about the source of a product since "consumers are not so likely to think that the maker of a mocked product is itself doing the mocking.").

To distinguish use of a trademark as an identifying source, as opposed to a non-identifier, *Jack Daniel's*, 599 U.S. at 157 (citing *Louis Vuitton Malletier S. A. v. Warner Bros. Entertainment Inc.*, 868 F.Supp.2d 172, 180 (S.D.N.Y. 2012)) provides the following example:

> Suppose a filmmaker uses a Louis Vuitton suitcase to convey something about a character (he is the kind of person who wants to be seen with the product but doesn't know how to pronounce its name). . . . Now think about a different scenario: A luggage manufacturer uses an ever-so-slightly modified LV logo to make inroads in the suitcase market. The greater likelihood of confusion inheres in the latter use,

---

[9] The Court reads Pixels' Affirmative Defense 6 that Pixels' works are "transformative works" as alleging its use of Jordan's Marks are to perform an expressive function separate from using the trademark as a trademark.

- 50 -

24cv923

because it is the one conveying information (or misinformation) about who is responsible for a product.

In Upper Deck's motion for summary judgment (ECF No. 79), Upper Deck argues that Pixels' use of Jordan's "likeness," including "nearly unaltered images of Jordan" is not subject to First Amendment protection under *Jack Daniel's*, 599 U.S. at 157—since Pixels had primarily used Jordan's likeness for commercial gain. (*Id.* at 13:1-5.) As discussed *supra* § III.A.3.i.a.1, Upper Deck's license to use Jordan's likeness involves the Jordan Name Trademark and Trademark 23.

In evaluating Affirmative Defenses 4 and 6, the primary issue is not whether Pixels had used Jordan's Marks in a commercial or expressive context, but whether Pixels used Jordan's Marks to represent the source of Pixels' products. *See Jack Daniel's*, 599 U.S. at 156 ("When . . . the use is 'at least in part' for 'source identification'—when the defendant may be 'trading on the good will of the trademark owner to market its own goods'—*Rogers* has no proper role"). In other words: did Pixels use the Jordan Name Trademark or Trademark 23 to imply where its own allegedly infringing products on its website originated from (*i.e.*, Pixels, Jordan, or Upper Deck)?

Upper Deck has met its initial burden to move for summary judgment, *see Celotex Corp.*, 477 U.S. at 322, by presenting evidence that Pixels used Jordan's Marks and/or the Upper Deck Hologram Mark in Pixels' products featuring pictures and photographs displaying Jordan's likeness. The pictures and photographs of Jordan displayed in Pixels' products at issue in this action are source-identifying insofar as they contain Jordan's Marks. *See Matal v. Tam*, 582 U.S. 218, 253 (2017) (Kennedy J., concurring) ("The central purpose of trademark registration is to facilitate source identification."); *cf Yuga Labs, Inc. v. Ripps*, 144 F.4th 1137, 1165 (9th Cir. 2025) ("[U]sing someone else's mark on the same type of product as the mark holder's [does not] qualif[y] as nominative fair use.").

Pixels has failed to show its use of Jordan's Marks is *not* for the purpose of source identification of its own goods, thereby trading on the goodwill associated with Jordan's Marks. More specifically, Pixels has not evinced that its use of Jordan's Marks in the

24cv923

creation and sale of its products is "solely to perform some other expressive function." *See Hara v. Netflix, Inc.*, 146 F.4th 872, 874 (9th Cir. 2025) (citing *Jack Daniel's*, 599 U.S. at 163) (following *Jack Daniel's*, defendant can assert First Amendment protections under *Rogers* "[g]iven the fleeting use of Vicky Vox's . . . image and likeness 'solely to perform some other expressive function' [as a minor character] on the Netflix show, *Q-Force* rather than to 'designate the source or origin of the show'. "); *see also Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1031 (9th Cir. 2024) (citing *Jack Daniel's*, 599 U.S. at 163) (following *Jack Daniel's*, defendant no longer entitled to *Rogers* defense where it used plaintiff's mark to "identify and distinguish" its own news products); *cf Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1009 (9th Cir. 2001) (defendant was not entitled to the nominative fair use defense when it used a photograph of the plaintiffs in its catalog for the purpose of selling its own goods rather than to refer to the plaintiffs).

Thus, even construing the evidence in favor of Pixels, the Court finds the *Rogers* defense does not apply. *Jack Daniel's*, 599 U.S. at 157. As such, the Court **GRANTS** Upper Deck's motion for summary judgment (ECF No. 79) as to Pixels' Affirmative Defenses 4 and 6—since both defenses are based on the *Rogers* doctrine. However, Pixels may raise the issue of their expressive use of Jordan's Marks insofar as it is relevant to the likelihood of confusion analysis at trial. *See Jack Daniel's*, 599 U.S. at 153.

## IV. COMMUNICATIONS DECENCY ACT (Affirmative Defense 8)

Pixels moves for summary judgment on its affirmative defense that Upper Deck's California state law claims, including Upper Deck's causes of action for violation of California statutory and common law right of publicity and unfair competition (Counts IV, V, VI, VII), are preempted under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 ("Section 230").[10] (ECF No. 74 at 2:22-25.) Upper Deck also moves for

---

[10] For the sake of completeness, the Court notes that Section 230 contains an exception to immunity for intellectual property causes of action. *See PC Drivers Headquarters, LP v. Malwarebytes Inc.*, 371 F. Supp. 3d 652, 658 n.3 (N.D. Cal. 2019) (citing 47 U.S.C. § 230(e)(2)) ("Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property."). As a matter of law, Section 230 does not apply to Upper Deck's Lanham Act claims in this action. *Enigma Software Grp. USA, LLC*

summary judgment on Pixels' Section 230 affirmative defense.  (ECF Nos. 79, 79-1 at 13:6–14:19.)

Under Section 230, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1) ("Subsection (c)(1)").  Further, "no provider or user of an interactive computer service shall be held liable on account of . . . any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1)."  *Id*.  Subsection (c)(1) only protects from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009), *as amended* (Sept. 28, 2009).

Here, Parties do not dispute that Pixels is the provider or user of an interactive computer service or that the products listed on Pixels' website are provided by "another information content provider" (*e.g.*, users of Pixels' website who upload products for sale).  See *Barnes*, 570 F.3d at 1101.

Rather, the primary issue Parties dispute is whether Pixels can be treated as a "publisher or speaker" subject to Section 230 immunity.  (ECF Nos. 79-1 at 13:7–14-19; 90 at 23:27–24:5; 117 at 23:10–25:6).

The Ninth Circuit has instructed courts to "examine each claim to determine whether a plaintiff's 'theory of liability would treat a defendant as a publisher or speaker of third-party content.' "  *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 740 (9th Cir. 2024).  "To put it another way, courts must ask whether the duty that the plaintiff alleges the defendant

*v. Malwarebytes, Inc.*, 946 F.3d 1040, 1053 (9th Cir. 2019) ("[T]he intellectual property exception contained in § 230(e)(2) encompasses claims pertaining to an established intellectual property right under federal law, like those inherent in a patent, copyright, or trademark.").  However, the Court follows the Ninth Circuit's conclusion that the Lanham Act's Section 230 intellectual property exception does not apply to bar state law intellectual property claims.  *See Perfect 10 v. CCBill, LLC*, 488 F.3d 1102, 1118–19 (9th Cir. 2007).

24cv923

violated derives from the defendant's status or conduct as a 'publisher or speaker.'" *Id.* (quoting *Barnes*, 570 F.3d at 1102).

Under *Calise*, 103 F.4th at 740–41, therefore, the Court must determine: (1) the legal duty that plaintiff alleges that defendant violated, and (2) whether that duty relates to defendant's status or conduct as a publisher or speaker. *Id.* (interpreting *Barnes,* 570 F.3d 1096) ("[E]ven though in *Barnes*, Yahoo's promise was to 'take down third-party content from its website, which is quintessential publisher conduct,' that did not alter the source of Yahoo's legal duty . . . [which] derived from something different—an agreement."); *see also Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021) (challenge to a product feature that allegedly incentivized users to travel at dangerously high speeds was not barred by Section 230 since plaintiff's product liability claim sought to hold defendant liable in "its distinct capacity as a product designer," not as a publisher).

### A.    "Publisher" Conduct Immunized by Subsection (c)(1) of Section 230 of the Communications Decency Act

Courts have held that, while advertising and curating content on websites constitute publishing conduct that can be immunized under Subsection (c)(1), the sale and distribution of physical products does not.

In *Calise*, the Ninth Circuit evaluated whether Meta could be immunized under Section 230 from Meta user plaintiffs' claims that they were harmed by fraudulent advertisements by scam vendors brought under California unfair competition law. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024). Plaintiff had purchased toys from advertisements on Meta's website, which either never arrived or appeared different from the advertisement—despite Meta representing that it removes fraudulent content in its terms of service. *Calise*, 103 F.4th at 737. *Calise* ultimately held that Section 230 immunity applies to bar statutory California unfair competition law claims against website operators based on advertising illicit content, since Meta's alleged failure to moderate deceptive advertising on its website "touche[d] on the quintessential publishing conduct." *Id.*, 103 F.4th at 744. *Calise* also held that Section 230 immunizes website operators from

- 54 -

California common law tort claims based on the same conduct. *Id.*, 103 F.4th at 743-44. Likewise, in *Perfect 10, Inc.*, a California district court held that Section 230 immunity applies to bar plaintiff's California right of publicity claim where the defendant website displayed search results containing plaintiff's likeness without plaintiff's permission—since the display and promotion of third-party content is a function of a publisher or speaker. *Perfect 10, Inc. v. Giganews, Inc.*, No. CV11-07098 AHM SHX, 2013 WL 2109963, at *15 (C.D. Cal. Mar. 8, 2013), *aff'd*, 847 F.3d 657 (9th Cir. 2017).

The Ninth Circuit has also held website operators' deployment of algorithms to filter and recommend content to users is considered an exercise of traditional editorial discretion protected as publishing conduct under Subsection (c)(1). *Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019). However, algorithmic recommendations that "materially contribute" to the unlawfulness of website content go beyond the "functions of an ordinary search engine." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1167-68 (9th Cir. 2008) (finding Roommate.com's search engine on its rental website forces users to reveal protected characteristics, *e.g.*, sexual orientation, that facilitates unlawful discrimination prohibited by housing law). Even if a particular tool "facilitate[s] the expression of information," it generally will be considered "neutral" so long as users ultimately determine what content to post, such that the tool merely provides "a framework that could be utilized for proper or improper purposes." *Roommates.com, LLC*, 521 F.3d at 1172 (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003)).

As another example, courts within the Ninth Circuit have found website operators are afforded immunity where websites offer menus of pre-prepared responses (*e.g.*, adwords) that users can select and combine to create infringing content (*e.g.*, advertisements that promote fraudulent services). *See Jurin v. Google Inc.*, 695 F. Supp. 2d 1117, 1123 (E.D. Cal. 2010) ("By suggesting keywords to competing advertisers Defendant merely helps third parties to refine their content . . . Defendant's keyword

24cv923

suggestion tool . . . is a 'neutral tool,' that does nothing more than provide options that advertisers could adopt or reject at their discretion.").

However, courts within the Ninth Circuit have found that internet businesses are not engaged in publishing conduct defined by Subsection (c)(1) when they "manufacture, distribute, sell, and offer to sell merchandise on [their websites]" or "fulfill[] sales of merchandise for . . . third parties." *Atari Interactive, Inc. v. SunFrog, LLC*, No. 18-CV-04949-JST, 2019 WL 3804462, at *2 (N.D. Cal. Aug. 13, 2019). *Calise* even reasoned that, though Section 230 publisher or editor immunity includes "review[ing] the content provided by [third parties]," it does not include "processing transactions." *Id.,* 103 F.4th at 741 (citing *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019)); *see also CYBERsitter, LLC v. Google Inc.*, 905 F. Supp. 2d 1080, 1086 (C.D. Cal. 2012) ("[T]o the extent Plaintiff's claims arise from Defendant's tortious conduct related to something other than the content of the advertisements, CDA immunity does not apply.").

Along this line of reasoning, the D.C. Circuit in *Parisi* noted that while Amazon was entitled to Section 230 immunity as a publisher of online descriptions of defamatory books, that immunity did not extend to Amazon's role in selling and distributing physical copies of those same books. *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 318 n.3 (D.D.C. 2011). Applying the D.C. Circuit's reasoning in *Parisi*, courts have found that Section 230 immunity does not apply where "Defendants print and *sell* the Infringing Merchandise, not merely . . . 'publish' infringing marks, names, or likenesses on their websites." *See e.g., Bravado Int'l Grp. Merch. Servs., Inc. v. Gearlaunch, Inc.*, No. CV 16-8657-MWF(CWX), 2018 WL 6017035, at *6 (C.D. Cal. Feb. 9, 2018) (emphasis in original) (citing *Parisi*, 774 F. Supp. 2d at 318 n.3); *see also Canvasfish.Com, LLC v. Pixels.Com, LLC*, No. 1:23-CV-611, 2024 WL 885356, at *14 (W.D. Mich. Mar. 1, 2024) (finding Pixels is not subject to Section 230 immunity for plaintiff's common law right of publicity claim because "Pixels does not benefit from simply allowing product descriptions or images . . . to be displayed on [its website]; it benefits from printing and shipping the finished products to consumers and charging them money for that service.").

24cv923

In sum, Pixels is entitled to Section 230 immunity where Upper Deck seeks to hold it accountable for the advertisement of allegedly infringing goods, or for creating website tools that allow users to search and view allegedly infringing goods based on images uploaded by third parties. However, Pixels is not entitled to Section 230 immunity to Upper Deck's California state law claims where Upper Deck seeks to hold Pixels accountable for manufacturing and selling the allegedly infringing products listed for sale on its website (*e.g.,* contracting with vendors to manufacture and ship illicit products).

**B.**     **Whether Pixels' Involvement in Selling Products is Publisher Conduct under Subsection (c)(1) Immunized by Section 230**

Pixels' websites enable third parties to upload images and to choose the formats available for printing the images, with the option of profiting from the sale of each print. (ECF No. 117-17 ¶¶ 13, 16.) Pixels' websites also allow purchasers to find those images using keywords set by uploaders (*id*. ¶¶ 17–19), and to buy the prints (*id*. ¶ 20). Pixels contracts with vendors who manufacture the physical prints ordered on Pixels' websites, and who ship those prints to purchasers. (*Id*. ¶ 20.) Generally, neither purchasers nor image uploaders have input into which vendors make the product or ship it. (*See* ECF No. 83-2 at 3:5-18.) If purchasers are not satisfied with their prints, Pixels facilitates product returns (ECF No. 117-17 ¶ 21) and offers a money-back guarantee (ECF No. 79-1 at 17). Pixels sets a base cost for each product, which image uploaders can adjust upwards and earn the amount of the sale increase on each sale. (ECF No. 117-17 ¶ 16.) Pixels earns the amount of the base cost on each sale. (*Id.*)

The Court finds to the extent that Upper Deck's California state law claims depend upon the online advertisement/display of illicit products or website content filtering tools, Pixels acts as an immunized publisher under Subsection (c)(1) and no triable issues remain as to Pixels' Section 230 defense (Affirmative Defense 8). Pixels does not create the illicit images of products uploaded and displayed on its site, and Pixels' website search engine and content filtering tools do not contribute to the creation of those products. *See e.g., Calise,* 103 F.4th at 737 (moderating third-party advertisements constitutes publishing

24cv923

conduct immunized by Subsection (c)(1)); *see also Roommates.Com, LLC*, 521 F.3d at 1167-68 (deploying search engines that do not materially contribute to unlawfulness of content are within website operators' editorial discretion immunized by Subsection (c)(1)); *see also Google Inc.*, 695 F. Supp. 2d at 1123 (keyword suggestion tool is a "neutral" tool that is "tantamount to the editorial process protected by the CDA," despite third-party use of the tool to create false advertisements).

However, to the extent that Upper Deck's California state law claims depend upon Pixels' involvement in offline manufacturing or selling physical prints containing infringing images (*e.g.*, hiring and coordinating with print and shipping vendors, facilitating product returns, offering a money-back guarantee), the Court finds Pixels does not act as a publisher under Subsection (c)(1) and triable issues remain as to Pixels' Section 230 defense (Affirmative Defense 8).  *See e.g., Atari Interactive, Inc.*, 2019 WL 3804462, at *2 (manufacturing, distributing, selling, and fulfilling sales of merchandise for third parties do not constitute immunized publishing conduct under Subsection (c)(1)); *Parisi v. Sinclair*, 774 F. Supp. 2d 310, 318 n.3 (D.D.C. 2011) (Amazon's immunity for descriptions of products online does not extend to facilitating sales of physical products).  Thus, Upper Deck cannot rely on false advertising as the "predicate violation" for its UCL claim, *supra* § III.B.2.i.b.  Nor can Upper Deck rely on false advertising as the analogous act to "passing off" underlying its common law unfair competition claim, *supra* § III.B.2.ii.

* * *

For the reasons above, to the extent Upper Deck seeks to hold Pixels accountable for displaying allegedly illicit images or deploying website content filtering tools on its California state law claims, the Court **GRANTS** Pixels' motion for summary judgment as to its Section 230 defense (ECF No. 74 at 2:22-25) and **DENIES** Upper Deck's motion for summary judgment on the same issue (ECF No. 79 at 13:6–14:19).

However, to the extent Upper Deck seeks to hold Pixels accountable for selling and distributing physical prints containing illicit images in its California state law claims, the Court **DENIES** Pixels' motion for summary judgment as to its Section 230 defense (ECF

24cv923

No. 74) and **GRANTS** Upper Deck's motion for summary judgment on the same (ECF No. 79).

## V.    CONCLUSION

The Court **GRANTS IN PART** Pixels' motion for summary judgment (ECF No. 74) regarding:

1. The two-year statute of limitations for Upper Deck's California law right of publicity claims;
2. Upper Deck's trademark dilution cause of action (Count 2); and
3. Pixels' Affirmative Defense 8 asserting Pixels' use of marks in advertising and displaying products that violate California state law is defended by Section 230

The Court **DENIES IN PART** Pixels' motion for summary judgment (ECF No. 74) regarding:

1. Upper Deck's cause of action for trademark infringement of its Upper Deck Hologram Mark (Count 3);
2. Upper Deck's false advertising claim (Count 1);
3. Upper Deck's false affiliation/endorsement claim (Count 1);
4. Upper Deck's right of publicity cause of action (Count 4);
5. Upper Deck's UCL cause of action (Count 6);
6. Upper Deck's common law unfair competition cause of action (Count 7);
7. The presumptive application of laches to bar Lanham Act claims falling outside of a three-year statute of limitations;
8. The two-year statute of limitations for Upper Deck's UCL and unfair competition law claims; and
9. Pixels' Affirmative Defense 8, to the extent Upper Deck asserts Pixels' role in selling products containing Jordan's likeness violates California state law

The Court **GRANTS IN PART** Upper Deck's motion for summary judgment (ECF No. 79) regarding:

1. Pixels' Affirmative Defense 7 for failure of condition precedent;

- 59 -

24cv923

2. Pixels' Affirmative Defenses 2 and 15 asserting Pixels is not the relevant trademark user;

3. Pixels' Affirmative Defenses 4 and 6 asserting Pixels' use of marks is defended by the First Amendment and/or is sufficiently transformative to warrant protection; and

4. Pixels' Affirmative Defense 8, to the extent Upper Deck asserts Pixels' use of marks in selling and distributing products that violate California state law

The Court **DENIES IN PART** Upper Deck's motion for summary judgment (ECF No. 79) regarding:

5. Pixels' Affirmative Defense 8, to the extent Upper Deck asserts Pixels' use of marks and/or Jordan's likeness in displaying or filtering products violates California state law

**IT IS SO ORDERED.**

**DATED: March 19, 2026**

_Cynthia Bashant_

**Hon. Cynthia Bashant, Chief Judge**
**United States District Court**

24cv923